## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UMANG KHETARPAL, BENJAMIN WEBB, GANG CHEN, TIMOTHY HEATH, and MINH NGUYEN, on Behalf of Themselves and All Others Similarly Situated, | Consolidated Case No.: 2:17-cv-01067 |
| Plaintiffs, | Judge Joseph F. Bianco |
| v. | |
| CEMTREX, INC., SAAGAR GOVIL, ARUN GOVIL and RENATO DELA RAMA, | |
| Defendants. | |

## AMENDED COMPLAINT FOR VIOLATIONS
## OF THE FEDERAL SECURITIES LAWS

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (SH-1887)
James Grohsgal (JG-1881)
Sebastiano Tornatore (to be admitted *pro hac vice*)
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Tel.: (203) 992-4523
Facsimile: (212) 363-7171

*Lead Counsel for Lead Plaintiffs and the Class*

TABLE OF CONTENTS

I.  SUMMARY OF THE ACTION ................................................................................ 2

II.  JURISDICTION AND VENUE .............................................................................. 5

III.  THE PARTIES ........................................................................................................ 5

    A.  Plaintiffs ............................................................................................................ 5

    B.  Defendants ......................................................................................................... 6

    C.  Relevant Non-Party ........................................................................................... 9

IV.  ADDITIONAL SUSBTANTIVE ALLEGATIONS .............................................. 9

    A.  Company Background ........................................................................................ 9

    B.  Arun Govil Begins to Build the House of Cards to Benefit Himself and Ducon ............ 10

    C.  Saagar Govil Assumes Management of the Company and Engages in an Undisclosed Paid
        Promotion Scheme to Pump the Company's Stock Price .................................. 13

        1.  Cemtrex Funnels Money to Paid Promoters Through At Least One Shell Company
            Controlled by A. Govil ............................................................................. 15

        2.  While Overseeing the Stock Promotion, Saagar Govil Secures Stock Options for
            Himself While Nearly Doubling His Salary ............................................. 19

    D.  Saagar Govil Follows in His Father's Footsteps and Misrepresents the Company's
        Purported Ownership Over an Indian Subsidiary ............................................ 20

    E.  After Pumping up the Stock Price, and Because the Company is Unable to Secure
        Traditional Financing, Cemtrex Uses Its Own Stock as Currency to Quickly Expand
        Operations ........................................................................................................ 28

        1.  Cemtrex Is Reliant on Using Its Common Stock as Currency and Related Party Debt
            Financing From Ducon Because It is Highly Leveraged, Unable to Secure Financing
            Through Traditional Means ....................................................................... 30

    F.  Defendants and Other Company Insiders Engage in Unreported Securities Transactions to
        Avoid Causing a Stock Decline That Would Prevent Cemtrex's Acquisitions ................ 32

        1.  Arun Govil Fails to Timely Report His or Ducon's Insider Holdings and
            Transactions ............................................................................................. 33

        2.  Saagar Govil Fails to Timely Report His Cemtrex Holdings and Transactions ........... 41

        3.  Renato Dela Rama Fails to Timely Report his Cemtrex Holdings and Transactions.... 47

        4.  Other Company Directors Fail to Timely Report their Cemtrex Holdings .................. 51

    G.  Defendants Tout the Company's EMS Automotive Segment Despite its Ongoing
        Troubles to Bolster Cemtrex's Upcoming Rights Offering ............................. 58

    H.  The Company Pays Peanuts to a Do-Nothing Audit Firm to Look the Other Way While
        the Individual Defendants Conceal Facts Related to Insiders' Reporting Compliance and
        Actively Misrepresent Facts Related to the Company's Purported Indian Subsidiary and
        German Automotive Business .......................................................................... 59

i

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ............ 61

   A.   Cemtrex Materially Misrepresents Its Ownership Interest In An Indian Subsidiary To Make The Company Appear Legitimate ........................................................................... 61

   B.   Defendants Materially Misrepresent Cemtrex's Insiders' Compliance With The Federal Securities Laws And The Effectiveness Of The Company's Disclosure Controls ........... 62

      1.   False and Misleading Statements Regarding Cemtrex Insiders' Compliance with Section 16(a) ................................................................................................................ 62

      2.   False and Misleading Statements about the Effectiveness of the Company's Disclosure Controls ..................................................................................................... 65

      3.   False and Misleading Statements About the Company's Insider Holdings .................. 76

   C.   Defendant S. Govil and the Company Materially Misrepresent the Prospects of the Company's EMS Segment and its Automotive Division ................................................... 77

VI.   THE TRUTH IS REVEALED OVER A SERIES OF PARTIAL DISCLOSURES WHILE THE COMPANY DOUBLES DOWN ON ITS MISINFORMATION AND CONTINUES MAKING FALSE STATEMENTS ................................................................................................ 79

   A.   Two Independent Investors/Financial Authors Bring Defendants' Misrepresentations To Light ................................................................................................................................. 79

   B.   The Company Enters Damage Control Mode And Continues To Spread Misinformation About Its SEC Reporting While Omitting Any Reference To Its Plan To Close One Of Its German Plants ................................................................................................................... 80

   C.   ROB Cemtrex Informs Its Employees And The German Works Council Of Its Intention To Close Its Recently Acquired Paderborn, Germany Facility ........................................ 83

   D.   German Language Media Begins To Report Cemtrex's Plans To Shutter The Paderborn, Germany Facility ............................................................................................................... 84

   E.   Company Insiders Seek To Correct Their Past Securities Law Violations By Belatedly Filing Form 4s That Evidence A Pattern Of Sales And Further Corroborate The Disclosure Articles .......................................................................................................... 85

   F.   Unemon1 Publishes A New Article Amplifying News Of Cemtrex's Planned Closure Of Its Paderborn, Germany Facility ...................................................................................... 86

VII.  POST-CLASS PERIOD EVENTS ................................................................................... 86

VIII. ADDITIONAL SCIENTER ALLEGATIONS ................................................................. 93

   A.   The Individual Defendants' Knowledge and/or Recklessness .......................................... 94

      1.   The Individual Defendants' Actual Knowledge of Their Own Undisclosed Insider Transactions in Company Stock ................................................................................... 94

      2.   A. Govil's Actual Knowledge of Material Misstatements Regarding Cemtrex India is Presumed Where He Maintained Majority Ownership of that Entity .......................... 95

      3.   The Individual Defendants' Actual Knowledge that their Statements About the Automotive Segment of Periscope Were False and Misleading When Made ............... 95

4. Cemtrex's Disclosure Control Deficiency Evidences a "Tone at the Top" that Disregarded Full and Candid Disclosure ...................................................... 96

B. The Individual Defendants' Motive to Commit the Alleged Fraud .................................. 97

1. The Individual Defendants' Use of Common Stock as Currency to Fund Acquisitions and Grow the Company Provided Motive to Commit Fraud........................................ 97

2. The Individual Defendants Oversaw Multiple Stock Buybacks in an Effort to Inflate Cemtrex's Stock Price............................................................................ 100

3. Defendant Arun Govil was Motivated to Commit Fraud so as to Clandestinely Sell Off Significant Holdings Through Ducon and Cash In on his Cemtrex Investment.......... 101

4. Defendant Dela Rama was Motivated to Commit Fraud So as to Cash in his Cemtrex Equity – his Primary Compensation from the Company ........................................... 105

5. The Individual Defendants Were Motivated to Conceal the Truth About the Closing of the Paderborn Facility and the Company's Automotive EMS Business in Order to Conduct the Rights Offering ...................................................................... 109

IX. LOSS CAUSATION ..................................................................................... 110

X. PRESUMPTION OF RELIANCE ...................................................................... 112

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................................ 113

XII. CLASS ACTION ALLEGATIONS .................................................................... 114

XIII. COUNTS.................................................................................................. 115

XIV. PRAYER FOR RELIEF ................................................................................ 119

XV. JURY DEMAND ........................................................................................ 119

Court-appointed Lead Plaintiffs Umang Khetarpal, Benjamin Webb, Gang Chen, Timothy Heath, and Minh Nguyen (collectively the "Cemtrex Investor Group" or "Lead Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of Cemtrex, Inc. ("Cemtrex" or the "Company") between December 26, 2012 and March 6, 2017, both dates inclusive (the "Class Period").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, among other things, the ongoing independent investigation of Court-appointed Lead Counsel, Levi & Korsinsky LLP ("Counsel"). This investigation includes, among other things, a review and analysis of: (i) public filings by Cemtrex with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movements and pricing data; (v) transcripts of conference calls with Cemtrex senior management; (vi) consultation with relevant experts and consultants; and (vii) other publicly available material and data identified herein. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting Lead Plaintiffs' allegations are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiffs believe that further evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.   **SUMMARY OF THE ACTION**

1.      At its core, this action represents the efforts of a father, son, and accomplice who used Cemtrex for their own private gain by manipulating the Company's common stock, to the detriment of Lead Plaintiffs and the investing public.

2.      The Defendants[1] presided over a scheme to hide the fact that throughout the Class Period, Cemtrex insiders were concealing myriad stock transactions from the market and their investors. They purposely skirted their mandatory reporting responsibilities under Section 16(a) of the Exchange Act to report all transactions, including sales, involving Cemtrex securities. They also concealed the exchange of debt instruments for additional securities which served to further entrench control over the Company in the hands of Arun Govil.

3.      Defendants' misrepresentations were exposed when, on February 22, 2017, a financial author and investor published an exposé piece identifying, *inter alia*, discrepancies in insider holdings in the Company's SEC filings.

4.      While dealing with the repercussions related to Cemtrex insiders' non-disclosure of their Company transactions, further issues came to light that cast a cloud over the Company's legitimacy: (i) for years, Cemtrex had claimed ownership over a purported Indian subsidiary that it did not actually own; and (ii) the Company had made the decision to shut down its recently-acquired automotive electronics manufacturing plant in Paderborn, Germany despite touting the financial outlook for that very sector and the Company's positioning to capitalize on its expected growth.

5.      Seeking to conceal this information from the market so as to avoid any signal to Lead Plaintiffs and outside investors that Company insiders were reducing their holdings or

---

[1] As used herein, "Defendants" refers to Cemtrex, Arun Govil ("A. Govil"), Saagar Govil ("S. Govil"), and Renato Dela Rama ("Dela Rama"), collectively.

otherwise executing advantageous stock exchanges to the detriment of common stockholders, Defendants regularly misrepresented the effectiveness of the Company's disclosure controls, all in the face of their own failures to comply with SEC disclosure requirements.

6.     The purpose was simple: any disruption to the Company's stock price would negatively impact the ability of Cemtrex to execute on its much-needed acquisitions – acquisitions that were predominately financed through the Company's use of stock as currency.

7.     In fact, leveraging the Company's common stock and related-party financing provided by A. Govil and his wholly-owned company, Ducon Technologies, Inc. ("Ducon"), was the only practical way that Cemtrex would be able to fund these acquisitions, as traditional routes of debt and equity financing were closed to the Company as a consequence of its suspect financial statements and its ineligibility to conduct an S-3 shelf registration, as admitted by the Company in 2016 when it withdrew its request.

8.     Cemtrex used these acquisitions and related-party debt to fatten the Company's financial statements, giving the illusion of a prospering Company while simultaneously lining the pockets of A. Govil, S. Govil, and Dela Rama through related party transactions, lucrative incentive awards, and unreported stock sales, respectively.

9.     The cover-up began to unravel in late February 2017 when two financial authors began publishing investigative articles on Seeking Alpha, exposing, *inter alia*, the discrepancies in the Company's reported insider holdings, failure to make the appropriate filings under Section 16(a), and misrepresentations about the performance of the Company's automotive business and about Cemtrex's ownership over an Indian subsidiary.  The publication of these articles sent the Company's common stock downwards from a closing price of $5.12 on February 21, 2017 (on

3

volume of 972,000 shares), to a closing price of $3.40 on February 22, 2017 on volume of more than 8.2 million shares – representing a loss of nearly 30%.

10.     The Company tried everything in its power to allay investor concerns, issuing a press release of its own and conducting a teleconference with investors on February 23, 2017 in which defendants A. Govil and S. Govil vehemently denied the claims made in the Pearson Article (defined herein) while proffering additional false statements about insider transactions to that point.

11.     Despite the Individual Defendants' best efforts to control the spin, by early March, *nearly every Cemtrex insider*, including defendants S. Govil and Dela Rama, belatedly filed a spate of Form 3 and Form 4 statements of beneficial ownership. This apparent corroboration of the claims made in the Disclosure Articles (defined herein) caused an additional drop in the Company's stock price to $3.35 per share on March 6, 2017 (the first trading date following defendant Dela Rama's belated filing and the day of S. Govil's filing), a nearly 9% decline over the closing price on March 3, 2017.

12.     All the while, the Company continued to try to hide the truth about its Electronic Manufacturing Segment: assets it had acquired just months earlier were failing and the Company would soon be forced to shudder a key facility that was supposedly central to the growing automotive electronics market.

13.     As alleged herein, each of the Defendants acted with the requisite scienter during the Class Period, either knowingly concealing the truth about Cemtrex insiders' non-compliance with the federal securities laws and the Company's ineffective internal controls in an effort to artificially prop up Cemtrex's stock price.  Defendants' scienter is multi-faceted and, when viewed holistically, shows a Company that was struggling to create any organic growth and

4

instead was highly reliant on acquisitions of other struggling companies, which it financed with related party debt and by using the Company's artificially inflated common stock as currency.

## II.   JURISDICTION AND VENUE

14.    The claims asserted herein arise pursuant to Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated therein, 17 C.F.R. § 240.10b-5.

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act, 15 U.S.C. §78aa.  In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. Cemtrex trades in an efficient market on the NASDAQ Capital Market ("Nasdaq").

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District.   Additionally, Defendant Cemtrex conducts business and maintains executive offices in this District at 19 Engineers Lane, Farmingdale, NY 11735.

## III.   THE PARTIES

### A.  Plaintiffs

17.    Court-appointed Lead Plaintiff Umang Khetarpal is an individual investor who purchased Cemtrex securities during the Class Period at artificially inflated prices and was damaged thereby, as previously set forth in his PSLRA certifications, filed with the Court on April 25, 2017 (ECF No. 22-2), incorporated herein by reference.

18.     Court-appointed Lead Plaintiff Benjamin Webb is an individual investor who purchased Cemtrex securities during the Class Period at artificially inflated prices and was damaged thereby, as previously set forth in his PSLRA certifications, filed with the Court on April 25, 2017 (ECF No. 22-2), incorporated herein by reference.

19.     Court-appointed Lead Plaintiff Gang Chen is an individual investor who purchased Cemtrex securities during the Class Period at artificially inflated prices and was damaged thereby, as previously set forth in his PSLRA certifications, filed with the Court on April 25, 2017 (ECF No. 22-2), incorporated herein by reference.

20.     Court-appointed Lead Plaintiff Timothy Heath is an individual investor who purchased Cemtrex securities during the Class Period at artificially inflated prices and was damaged thereby, as previously set forth in his PSLRA certifications, filed with the Court on April 25, 2017 (ECF No. 22-2), incorporated herein by reference.

21.     Court-appointed Lead Plaintiff Minh Nguyen is an individual investor who purchased Cemtrex securities during the Class Period at artificially inflated prices and was damaged thereby, as previously set forth in his PSLRA certifications, filed with the Court on April 25, 2017 (ECF No. 22-2), incorporated herein by reference.

**B. Defendants**

22.     Defendant Cemtrex purportedly "offers manufacturing services of advanced electronic system assemblies, provides broad-based industrial services, and provides industrial air filtration & environmental control equipment and systems globally."  From 2007 until April 2015, the Company's common stock was traded on the Over-the-Counter Bulletin Board ("OTCBB") under the ticker symbol "CTEI."   On June 25, 2015, Cemtrex's common stock was uplisted and began trading on the Nasdaq under the ticker symbol "CETX."

6

23.     Defendant Arun Govil[2] ("A. Govil") is the Executive Director of the Company. A. Govil previously held the position of Company Chairman, Chief Executive Officer, President and Treasurer from 2004 until his resignation in December 2011.

24.     Defendant Saagar Govil ("S. Govil") is the Company's President and Chief Executive Officer, having assumed that role in December 2011.   Prior to becoming the Company's CEO, Saagar was Cemtrex's Vice President of Operations.

25.     Defendant Renato Dela Rama ("Dela Rama") is the Company's Vice President of Finance and is sometimes referred to as Cemtrex's Chief Financial Officer, having purportedly assumed both roles in December 2004.  Dela Rama is also employed by Ducon as its controller.

26.     Defendants A. Govil, S. Govil, and Dela Rama are collectively referred to herein as the "Individual Defendants" and, together with Cemtrex, the "Defendants."

27.     Each of the Individual Defendants, by virtue of his high-level position with Cemtrex, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his respective tenure with the Company, as alleged herein.  As alleged below in Sections V and VII, the materially false or misleading information conveyed to the public resulted from the collective actions of the Individual Defendants.  Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

---

[2] Throughout the Company's SEC filings and other public statements, A. Govil's first name is spelled both as "Arun" and "Aron."

28.     As executive officers and/or directors of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the Nasdaq, and governed by the federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

29.     Each of the Individual Defendants, because of his position of control and authority as an executive officer and/or director of Cemtrex, was able to and did control the content of the SEC filings, press releases, and other public statements that Cemtrex issued during the Class Period, was provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the materially false or misleading public statements alleged herein.

30.     Each of the Individual Defendants, because of his position of control and authority as an executive officer and/or director of Cemtrex, had access to the adverse undisclosed information about Cemtrex's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Cemtrex officers and employees, attendance at Cemtrex management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these

adverse undisclosed facts rendered the representations made by or about Cemtrex materially false or misleading.

31.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Cemtrex securities by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding Cemtrex's products, business, operations, and management, and the intrinsic value of Cemtrex common stock; and (ii) caused Lead Plaintiffs and members of the Class to acquire Cemtrex common stock at artificially inflated prices.

### C.  Relevant Non-Party

32.     Non-Party Ducon is a private company that manufactures equipment and systems for environmental control, material handling, waste incineration and power transmission.  Arun Govil is Ducon's CEO and sole owner and the company is also headquartered at 19 Engineers Lane, Farmingdale, NY 11735.

## IV.    ADDITIONAL SUSBTANTIVE ALLEGATIONS

### A.  Company Background

33.     Originally incorporated as "Diversified American Holdings, Inc." in 1998, the Company changed its name to "Cemtrex Inc." on December 16, 2004.  Since then, Cemtrex has purportedly grown through several acquisitions from its original focus on the provision of industrial environmental control equipment to one that now operates in several different segments with manufacturing and sales around the globe.

34.     Cemtrex's business is now operated through three distinct segments: Electronics Manufacturing Serves (EMS); Industrial Products & Services (IPS); and the Monitoring Instruments and Products group (MIP).

35.     Through its EMS segment, Cemtrex provides third-party clients with electronic manufacturing services, including product design and engineering services, printed circuit board assembly and production, cabling and wire harnessing, systems integration, testing services and turnkey assembled electronic products.

36.     Cemtrex's IPS segment sells air filtration and environmental control products to a wide variety of industrial customers worldwide, while also providing for the erection, relocation, and maintenance of this equipment.

37.     Cemtrex's MIP group manufactures and sells instruments for emissions monitoring, process analysis, and controls for industrial applications and compliance with environmental regulations.

**B.   Arun Govil Begins to Build the House of Cards to Benefit Himself and Ducon**

38.     On December 30, 2004, Cemtrex purchased from Ducon certain business assets relating to the design, assembly, sale, and maintenance of environmental emissions monitors (the "MIP Division") – a private company owned by Texar Inc. – itself a private corporation wholly owned by Arun Govil which was engaged in the air pollution control systems business.  In consideration for the MIP Division purchase, Cemtrex issued to Ducon 3,250,000 shares of Cemtrex common stock valued at approximately $500,000.  The asset purchase agreement entered into between the two parties was signed by Arun Govil on behalf of Ducon (despite also acting as Cemtrex's President at the same time) and defendant Dela Rama, as Vice President of Cemtrex.

39.     The movement of assets into the Cemtrex corporate form was a financial maneuver designed by A. Govil to double-dip in salaries and enrich himself through both Ducon and Cemtrex.

40.    For example, even after collecting the equity for the sale of the MIP division to Cemtrex in 2004, Arun Govil and his wife Vandana Govil (who was then acting as a director and secretary to Cemtrex) received salaries from Cemtrex of $125,000 each in 2007 and 2008, compared to a reported net income of just $118,000 for the Company for 2008 and a net loss of $123,000 in 2007.   While Vandana Govil would purportedly resign from her positions at Cemtrex as of May 27, 2009, the Form 10-K filed by the Company with the SEC on January 13, 2010 for the year ended September 30, 2009 indicates that Ms. Govil still collected $125,000 for that year, with Arun Govil increasing his salary to $150,000, compared to a Company net income of $155,000 in the same year.

41.    The Company only sporadically filed any of the required reports with the SEC, instead operating in the darkness as Arun Govil manipulated the Company to his will.   For example, in order to partially finance the $2,750,000 April 2007 acquisition of Griffin Filters LLC ("Griffin") (an entity wholly owned by A. Govil) by Cemtrex, the Company issued a four year convertible debenture in the amount of $1.3 million, paying interest of 8.0% per year and convertible into 30,000,000 shares of Cemtrex common stock.   On September 9, 2009, the Company entered into a letter agreement with Arun Govil by which the parties agreed to cancel the note in favor of granting Arun Govil 2,500,000 shares of Cemtrex common stock and 1,000,000 shares of Series A preferred stock.   The Series A preferred shares carried with them a number of votes equal to the result of: (i) the number of shares of common stock issued and outstanding at the time of such vote multiplied by 1.01; divided by (ii) the total number of Preferred Stock issued and outstanding at the time of such vote.

42.     Arun Govil wielded his power totally unchecked, as the Company's board of directors at the time consisted entirely of Cemtrex employees: defendant Dela Rama (VP of Finance); Ravi Narayan (VP of MIP Division); and Metodi Filipov (VP).

43.     By the end of 2008, Arun Govil's tight control over every aspect of the Company was well established by virtue of his control over more than 86% of Cemtrex's common stock.

44.     In actuality, Arun Govil used Cemtrex as a front for his own self-dealing, selling assets already within his control to the Company so that he would then be able to loan money to the Company to finance the purchase (for which he received favorable note terms and/or additional Company equity).   All the while, he engaged in related party transactions, including Ducon's purported purchase of millions in goods from Cemtrex during its nascent years:

|  | Net Sales | Sales to Ducon | % of Total Sales | Accounts Receivable from Ducon | Accounts Receivable From Non-Ducon Entities | % of Total Accounts Receivable Attributable to Ducon |
|---|---|---|---|---|---|---|
| 2010 | 3,304,055.00 | 200,000.00 | 6% | 200,000.00 | 31,968.00 | 21% |
| 2011 | 13,732,153.00 | 8,920,875.00 | 65% | 1,127,575.00 | 261,549.00 | 81% |
| 2012 | 12,162,046.00 | 7,260,425.00 | 60% | 354,786.00 | 293,155.00 | 55% |
| 2013 | 13,673,531.00 | 10,799,872.00 | 79% | 1,206,372.00 | 641,264.00 | 65% |

45.     The next phase of the Company would involve the elevation of Arun's son, Saagar into a management position.

**C. Saagar Govil Assumes Management of the Company and Engages in an Undisclosed Paid Promotion Scheme to Pump the Company's Stock Price**

46.     Saagar Govil joined Cemtrex in July 2008, quickly attaining the position of Vice President of Operations and then Secretary and General Manager of Operations, as well as acting as a member of the Cemtrex Board under his father Arun, who was then still acting as the Company's CEO.

47.     Soon, Saagar replaced his father as CEO of Cemtrex, with Arun submitting his letter of resignation on December 19, 2011.

48.     Saagar Govil's equity position upon joining Cemtrex is murky, however, as the Company's SEC filings made prior to his appointment as CEO omit any reference to his holdings.  Instead, as would be disclosed in the annual report filed on Form 10-K on January 10, 2012, Saagar appeared to control a 3,000,000 share block of Cemtrex common stock, second in size only to the 25,430,000 share block controlled by his father

49.     Saagar's equity position would continue to swell, with the Company reporting in its Annual Report on Form 10-K filed with the SEC on January 16, 2014 that Cemtrex was significantly controlled by the Govils:

| Title of Class | Name and Address of Holder | Title | Amount Owned | Percentage of Issued Stock (1) |
|---|---|---|---|---|
| Common Stock | Arun Govil<br>19 Engineers lane<br>Farmingdale, NY 11735 | Chairman of the Board | 20,430,000 (2) (3) | 50.3 |
| Preferred Stock | Arun Govil<br>19 Engineers lane<br>Farmingdale, NY 11735 | Chairman of the Board | 1,000,000 (2) | |
| Common Stock | Saagar Govil<br>19 Engineers lane<br>Farmingdale, NY 11735 | Chief Executive Officer | 8,000,000 | 19.7 |
| Common Stock | Ravi Narayan<br>19 Engineers lane<br>Farmingdale, NY 11735 | Vice President & Director | 800,000 | 2.0 |
| Common Stock | Renato Dela Rama<br>19 Engineers lane<br>Farmingdale, NY 11735 | Chief Financial Officer & Director | 400,000 | 1.0 |
| | All directors and executive officers as a group (4 persons) | | 29,630,000 | 73.0 |

50.    In actuality, Defendants were positioning the Company for the next step in their scheme: an uplisting to the Nasdaq.  First, however, Cemtrex would engage in a 6-for-1 reverse stock split, converting every 6 shares of Cemtrex common stock into 1 new share of common stock to be traded on the Nasdaq.  The conversion was effective as of April 15, 2015 and S. Govil lauded the move as an important milestone for the Company:

> We view this reverse split as one of the last remaining steps in meeting the requirements to be on the exchange and are working to get this important company milestone completed swiftly. Uplisting to a major exchange like NASDAQ will better enable us to attract a broader range of institutional investors and increase share liquidity.

51.    On April 23, 2015, the Company announced the appointment of Raju Panjwani and Sunny Patel as directors, as well as the resignation of Ravi Narayan and Renato Dela Rama from their director positions.

14

52.    The stock split may have decreased the total number of Company shares outstanding, but, as reported in the proxy statement filed on Schedule 14A on February 8, 2016, the Govils maintained their tight grip over Cemtrex, controlling approximately 58% of common stock issued, with 3,405,000 shares purportedly held by A. Govil and 1,333,334 held by S. Govil.

53.    On June 25, 2015, the Company's common stock began trading on the Nasdaq. Saagar Govil then began to pump Cemtrex's stock price through the use of a paid promotional scheme.

**1.  Cemtrex Funnels Money to Paid Promoters Through At Least One Shell Company Controlled by A. Govil**

54.    Beginning in at least October 2015, Cemtrex conspired in a stock promotion scheme orchestrated by Small Cap Specialists LLC ("SCS") – a self-described marketing and advertising company that features small cap stocks on its website and in its promotional email blasts in exchange for monetary compensation.

55.    While SCS's October 14, 2015 promotional article claimed that SCS was not compensated for the mention of Cemtrex in any way, that position changed by May 17, 2016, at which point SCS reported that it has "been compensated twenty thousand dollars cash via bank wire by Star Media LLC for a two day investor relations/media campaign of CETX."  That two-day investor relations campaign would result in four separate email blasts by SCS on May 17, 2016, each touting Cemtrex's financial prospects.

56.    The promotional effort proved to be a rousing success, as Cemtrex saw its daily trade volume increase from approximately 570,000 shares transacted on May 16, 2016, to ***more than 2.34 million shares traded on May 17, 2016, representing more than 25% of all Cemtrex***

**common stock issued and outstanding as of June 30, 2016** – volume that increased the Company's stock price from $2.34 per share to $2.49 per share.

57.     Unsurprisingly, Star Media LLC engaged SCS for an additional promotional campaign and on June 2, 2016, SCS issued four additional blasts pointing to Cemtrex as "one [that] should go back on everybody's radar."

58.     For its June 2, 2016 efforts, SCS reported being paid "five thousand dollars cash via bankwire by star media for this one day update and mention of CETX."

59.     Yet SCS was not the only stock promoter touting Cemtrex on this day.   In addition, SmallCapLeader.com issued an email blast of its own promoting Cemtrex on June 2, 2016, reporting that it has "been compensated five thousand dollars by a third party (Third Coast Media, LLC) for this investor awareness campaign update regarding CETX. Smallcapleader.com has previously been compensated twenty thousand dollars for an investor awareness campaign regarding CETX, which has expired."

60.     Third Coast Media, LLC issued a promotional email blast of its own on June 2, 2016 under the name "StockCommander.com".   In that email disclaimer, StockCommander reported:

> StockCommander.com as well as this newsletter (hereafter called "SC") is an information and marketing firm wholly owned by Third Coast Media, LLC and is not a financial analyst, investment adviser or broker/dealer. SC is in the business of marketing and advertising companies to generate exposure of them by sending alerts to our subscribers for monetary compensation. ***Third Coast Media, LLC has historically been compensated a total of eighty-three thousand six hundred dollars from a non-controlling third party) for CETX advertising and promotional services.***[3]

61.     SCS followed up with additional promotion of the Company on June 6, 2016, claiming that it was not being compensated for that particular mention of Cemtrex, but

---

[3] Unless otherwise indicated, all emphasis is added.

reaffirming that it had previously been compensated $25,000 from Star Media LLC for its coverage of the Company.

62.     The volume and stock price bump were even more drastic than the prior promotion, with the Company's stock increasing in volume and price from 124,000 shares transacted and a closing stock price of $2.15 on June 1, 2016 to a closing price of $3.44 over the next five trading days, all driven by stock volume that dwarfed the Company's previous numbers:

| Date | Closing Stock Price | Trade Volume |
|---|---|---|
| 6/1/2016 | $2.15 | 124,677 |
| 6/2/2016 | $2.43 | 1,950,897 |
| 6/3/2016 | $2.76 | 912,482 |
| 6/6/2016 | $3.42 | 2,265,688 |
| 6/7/2016 | $3.30 | 1,108,655 |
| 6/8/2016 | $3.44 | 663,370 |

63.     Importantly, the June 2016 promotions coincided with the Company's public announcement of its acquisition of Periscope GmbH ("Periscope"), for which Cemtrex used its stock, evidencing that the joint purpose of the promotional scheme was to increase the value of the stock being used as currency to finance the acquisition while also amplifying perceived good news into the market.

64.     An additional promotional article about Cemtrex was released on June 22, 2016 by SmallCapLeader.com, this one disclosing that it has been "compensated ten thousand dollars by a third party (Third Coast Media, LLC) for this investor awareness campaign update regarding CETX."

65.     The promotional scheme continued throughout the year, with SCS publishing an article touting Cemtrex on October 11, 2016 as "[a] true growth story feature profile."  Besides reiterating much the Company's recent press releases and providing a link to Cemtrex's letter to

17

shareholders, the October 11th letter's disclaimer informed readers that "SCS LLC has been compensated ***thirty thousand dollars' cash via bank wire by Southern Steel and Construction, Inc.*** for two to three days' coverage of CETX."

66.    Notably, the payment to SCS from Southern Steel and Construction, Inc. ("Southern Steel") was coming from a now-dissolved corporate entity directly controlled by Arun Govil, himself, and operating out of the same address as Cemtrex and Ducon:

### NYS Department of State
### Division of Corporations
### Entity Information
The information contained in this database is current through April 23, 2018.

Selected Entity Name: SOUTHERN STEEL & CONSTRUCTION INC.

| Selected Entity Status Information | |
| --- | --- |
| Current Entity Name: | SOUTHERN STEEL & CONSTRUCTION INC. |
| DOS ID #: | 4244910 |
| Initial DOS Filing Date: | MAY 14, 2012 |
| County: | SUFFOLK |
| Jurisdiction: | NEW YORK |
| Entity Type: | DOMESTIC BUSINESS CORPORATION |
| Current Entity Status: | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Aug 31, 2016) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.ny.gov keyword TR-194.1 or by telephone at (518) 485-6027

| Selected Entity Address Information | |
| --- | --- |
| DOS Process (Address to which DOS will mail process if accepted on behalf of the entity) | |
| ARON GOVIL | |
| 19 ENGINEERS LANE | |
| FARMINGDALE, NEW YORK, 11735 | |
| Registered Agent | |
| NONE | |

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

| *Stock Information | | | Name History | | |
| --- | --- | --- | --- | --- | --- |
| # of Shares | Type of Stock | $ Value per Share | Filing Date | Name Type | Entity Name |
| 200 | No Par Value | | MAY 14, 2012 | Actual | SOUTHERN STEEL & CONSTRUCTION INC. |

67.    The promotional efforts by Company insiders paid off, with Cemtrex increasing its stock price from less than $4.00 per share in June 2015 (when the Company uplisted to the Nasdaq) to more than $8.00 per share by January 2017.  All the while, Defendants were seeking to manipulate the market by making false and misleading statements about their ownership interest in Cemtrex so as to spur further outside investment and allow each to cash out portions of their equity at inflated amounts.

**2. While Overseeing the Stock Promotion, Saagar Govil Secures Stock Options for Himself While Nearly Doubling His Salary**

68.     While the Company tested the stock promotion waters with SCS in late 2015, that investment would pick up in earnest with the additional payments made to the promoter beginning in the spring of 2016.  However, before setting up the Company's stock price to jump on the heels of promotional efforts, the Individual Defendants were sure to secure for Saagar Govil additional equity.

69.     That equity came in the form of stock options to purchase 200,000 shares of Company common stock granted to Saagar Govil on February 12, 2016.  These options were assigned a strike price of $1.70 per share.

70.     The options were subject to a two year vesting period, with 100,000 shares being vested and exercisable as of the one year anniversary of the grant and the remaining 100,000 shares exercisable on the second anniversary of the grant, provided that Saagar Govil remained employed by the Company.

71.     Similarly, on December 5, 2016, the Company granted options to Saagar Govil to purchase an additional 200,000 shares of Company common stock at an exercise price of $4.24 per share, also vesting over a two year period from the date of grant.

72.     In addition to securing these additional stock options for himself, Saagar Govil also used the Company's artificially inflated stock price to validate nearly doubling his salary from 2016 to 2017:

| PRINCIPAL AND POSITION | YEAR | SALARY | OPTION AWARDS |
|---|---|---|---|
| Saagar Govil | 2016 | $150,000 | $340,000 |
|  | 2017 | $250,000 | $848,000 |

**D. Saagar Govil Follows in His Father's Footsteps and Misrepresents the Company's Purported Ownership Over an Indian Subsidiary**

73.     Beginning with its annual report filed on Form 10-K with the SEC on January 14, 2011 and signed by A. Govil, S. Govil, and Dela Rama, the Company began representing its purported ownership of a subsidiary in India called Cemtrex India Private Ltd. ("Cemtrex India"), claiming:

- "The Company has also set up a subsidiary Cemtrex India Private Ltd., in India to sell environment control equipment & systems along with emission monitoring products to industrial clients in India and nearby countries";

- "The Company sells air filtration and environmental control products through its subsidiary Griffin Filters Llc and Cemtrex India Pvt. Ltd."; and

- "The Company's Indian subsidiary leases approx. 5000 sq. ft. of office and warehouse space in Mumbai, India from a third party on a month to month basis at a monthly rent of $570."

74.     In its subsequent quarterly reports, the Company stated in no uncertain terms that Cemtrex India was wholly-owned by Cemtrex, stating:

> The accompanying consolidated financial statements include the accounts of Cemtrex, Inc. and its wholly subsidiaries Griffin Filters, LLC and Cemtrex India Pvt. Ltd., (collectively the "Company").

75.     This statement appears verbatim in the Form 10-Q filed by the Company on February 22, 2011; Form 10-Q filed on May 16, 2011; and the Form 10-Q filed August 15, 2011.

76.     Yet, despite the Company's purported ownership over Cemtrex India, any mention of the entity would disappear from the Company's SEC filings beginning with Cemtrex's Annual Report filed on Form 10-K for the fiscal year ended September 30, 2011, as

filed with the SEC on January 10, 2012.  Therein, with respect to the Company's subsidiaries, Cemtrex pointed only to Griffin.

77.     Cemtrex India remained absent from the Company's filings until December 21, 2015 when the Company, now headed by Saagar Govil, filed its annual report on Form 10-K for the fiscal year ended September 30, 2015, as signed by defendants A. Govil, S. Govil, Dela Rama, and the other members of Cemtrex's Board.  Therein, alongside Griffin and ROB Cemtrex, among others, was Cemtrex India, purportedly 100% owned by Cemtrex:

The Company's consolidated subsidiaries and/or entities are as follows:

| Name of consolidated subsidiary or entity | State or other jurisdiction of incorporation or organization | Date of incorporation or formation (date of acquisition, if applicable) | Attributable interest |
|---|---|---|---|
| Griffin Filters, LLC | New York | September 6,2005 (April 30,2007) | 100% |
| ROB Cemtrex GmbH | Germany | August 15, 2013 (October 31, 2013) | 100% |
| Cemtrex Ltd | Hong Kong | September 4, 2013 | 100% |
| ROB Systems, Srl. | Romania | November 1, 2013 | 100% |
| Cemtrex India (Pvt) Ltd. | India | April 10, 2009 | 100% |

The consolidated financial statements include all accounts of the Company and its wholly-owned subsidiary as of the reporting period end dates and for the reporting periods then ended.

78.     The Amended Form 10-K filed by the Company on August 25, 2016 made the same representation.  Tellingly, the Company discontinued its claim to ownership after the 2016 Amended 10-K, with no mention of Cemtrex India in any of the quarterly or annual reports for 2017 onwards.

79.     In actuality, and as would only come to light after the publication of Unemon Article 1 (defined herein), Cemtrex has no ownership in Cemtrex India, as reported to the Indian Ministry of Corporate Affairs (the "MCA").[4]  Instead, A. Govil, in his individual capacity, controls the vast majority of that entity.

80.     After its incorporation with the MCA in 2008, Cemtrex India reported five shareholders with A. Govil controlling 75% of the Company's outstanding shares:

---

[4] To the extent Cemtrex India's documents were filed with the MCA, they are not readily accessible to Cemtrex shareholders.  MCA documents are held behind a pay wall that requires use of an India-based credit card or bank account to access.

## RETURN OF ALOTTEMENT

TYPES OF SHARES

AMOUNT PER SHARE

EQUITY

RS. 10/- EACH

LIST OF SHARE HOLDERS WITH ADDRESS   as on 30-12-2008

| FOLIO NO. | LIST OF ALLOTEES | NO. OF SHARES |
|---|---|---|
| 1 | ARUN GOVIL<br>19, ENGINEERS LANE<br>FARMINGDALE, NY 11735, USA | 30,000 |
| 2 | UNIMARK INTERNATIONAL PVT.LTD.<br>109-8, HAZARA ROAD<br>KOLKATTA 700 206 | 4,000 |
| 3 | KIRAN PATIL<br>FLAT NO. - 402-A-6<br>JHELUM CHS LTD., LOK UPVAN, PHASE - I<br>SMT GLADYS ALVARES MARG,<br>OFF POKHARAN ROAD NO. 2,<br>THANE WEST - 400 601 | 2,000 |
| 4 | SANDEEP PARIKH<br>B - 7, ANAND BHAVAN<br>BAJAJ ROAD, VILE PARLE (WEST)<br>MUMBAI, MAHARASHTRA, INDIA - 400 056 | 2,000 |
| 5 | RAVI NARAYAN<br>301, JALA SHIV DHARSHAN APTS 15<br>MAIN JP NAGAR, V PHASE<br>BANGALORE 560078 | 2,000 |
| | TOTAL NO.OF SHARES | 40,000 |

For CEMTREX (INDIA) PRIVATE LIMITED

DIRECTOR

22

81.      Further, as of September 30, 2010 (the fiscal year represented by the Company in the first SEC filing where it represented that Cemtrex India was a wholly-owned subsidiary), Cemtrex India was representing in its annual report submitted to the MCA as of the same date that it had just five shareholders, with A. Govil increasing his stakes in the Company to maintain his control:

Annexure 'A'

V  Details of shares / debentures held at date of AGM

Types of shares - Equity

Amount per share -  Rs.10/- each

### LIST OF SHARE HOLDERS WITH ADDRESS

| Folio No | Name of Share Holder | No. of shares |
|---|---|---|
| 1. | Patil Kiran<br>Flat No. 402-A-6<br>Jhelum Co-operative Housing Society Ltd.<br>Lok Upvan, Phase-I,<br>Smt.Gladys Alvares Marg,<br>Off. Pokhran Road No.2,<br>Thane West – 400 601 | 2500 |
| 2. | Parikh Sandeep<br>B-7 Anand Bhavan,<br>Bajaj Road,<br>Vile Parle (W),<br>Mumbai – 400 056 | 2500 |
| 3. | Govil Arun<br>19, Engineers Lane<br>Farmingdale, NY 11735<br>USA | 37500 |
| 4. | M/s. Unimark International Pvt. Ltd.<br>109-8, Hazara Road<br>Kolkata 700 206 | 5000 |
| 5. | Ravi Narayan<br>301 Jala Shiv Darshan Apts.,15<br>Main J P Nagar, V Phase,<br>Bangalore  - 560 078 | 2500 |
| | Total No. of Shares | 50000 |

Cemtrex (I) Private Limited

Director

Cemtrex (I) Private Limited

Director

82.    By 2015, A. Govil would tighten his grasp over Cemtrex India, coming to hold

80% of that company's shares as of March 31, 2015:

24

**List of Shareholders as on 31.03.2015**

| SR. NO. | Name | Father's/ Husband's Name | Address | Type Of Security | Number Of Shares | Nominal Value | Nationality |
|---|---|---|---|---|---|---|---|
| 1 | Arun Devendra Govil | Devendra Govil | P O Box 422, Jericho, New York 11753, United States Of America | Equity Shares | 40000 | Rs.10/- | NRI |
| 2 | Sandeep Parikh | Padmakant Parikh | B7, Anand Bhavan, Bajaj Road, Vile Parle (West), Mumbai 400056. | Equity Shares | 2500 | Rs.10/- | Indian |
| 3 | Ravi Narayan | Narayanasamy Chandran | 301, Jala Shiv Dharshan Apts 15, Main Jp Nagar V Phase, Bangalore 560078. | Equity Shares | 2500 | Rs.10/- | Indian |
| 4 | Unimark Internetional Private Limited | | 30 D Jawaharlal Nehru Road, block D, P S Park Street, Kolkata 700016. | Equity Shares | 5000 | Rs.10/- | Indian Company |
| | | | Total | | | 50000 | |

For & on behalf of Board
CEMTREX (INDIA) PVT. LTD.

Aron Govil
Director

Sandeep Parikh
Director

83.    This shareholder breakdown would the same as of March 31, 2016, as reported by

Cemtrex India to the MCA:

# CEMTREX (INDIA) PRIVATE LIMITED

Plot No. A/4, Road No.1, Behind Aplab Company, MIDC, Waghale Industrial Estate, Thane
Tel : 26242953

**List of Shareholders as on 31.03.2016**

| SR. NO. | Name | Father's/ Husband's Name | Address | Type Of Security | Number Of Shares | Nominal Value | Nationality |
|---|---|---|---|---|---|---|---|
| 1 | Arun Govil | Devendra Govil | P O Box 422, Jericho, New York, 11753, United States Of America | Equity Shares | 40000 | Rs.10/- | NRI |
| 2 | Sandeep Parikh | Padmakant Parikh | B7, Banand Bhavan, Bajaj Road, Vile Parle (West), Mumbai-400056. | Equity Shares | 2500 | Rs.10/- | Indian |
| 3 | Ravi Narayan | Narayanasamy Chandran | 301, Jala Shiv Dharshan Apts, 15, Main JP Nagar, V Phase, Bangalore-560078. | Equity Shares | 2500 | Rs.10/- | Indian |
| 4 | Unimark Internetional Private Limited | NA | 30 D, Jawaharlal Nehru Road, Block-D, P S Park Street, Kolkata-700016. | Equity Shares | 5000 | Rs.10/- | Indian |
| | | | | Total | 50000 | | |

For and on behalf of the Board of Directors,
For Cemtrex (India) Private Limited

Arun Govil
Director

Sandeep Parikh
Director

84.     Any claim by Defendants that these shares were not actually held by these individuals and were instead 100% held by the Company (as represented in Cemtrex's SEC filings) is belied by Cemtrex India's shareholders' own words.  On July 28, 2015, A. Govil, as a director of Cemtrex India, filed a consent of shareholder for shorter notice pursuant to section 101(1) of the Companies Act, 2013, asserting his ownership of the shares "in his own name":

26

THE COMPANIES ACT, 2013
**Consent of shareholder for shorter notice**
*[pursuant to section 101(1)]*

To
The Board of Directors
Plot No. A/4, Road No.1, Behind Aplab Company,
MIDC, Waghale Industrial Estate'
Thane-400604

I, Arun Devendra Govil, son of Mr. Devendra Govil, resident of  P O Box 422, Jericho, New York, 11753, United States Of America, holding 40000 equity shares of Rs. 10/- each  in the company in my own  name hereby give consent, pursuant to section 101(1) of the companies Act, 2013, to hold the annual general meeting on 28th July, 2015  at a shorter notice.

Aron Govil
Director

Date: 28th July, 2015

85.     Similar letters of consent and representations were made by Sandeep Parikh, Ravi Narayan, and Unimark International Pvt. Ltd.

86.     As such, not only was Cemtrex misrepresenting its ownership interest in Cemtrex India, it was wholly failing to inform the investing community that its purported subsidiary was actually controlled by a small group of individuals, *one of whom was censured and expelled by the PCAOB*.

87.     Sandeep Parikh had been a partner at the public accounting firm Parikh & Associates when, in April 2013, the PCAOB entered an order instituting disciplinary proceedings censuring P. Parikh & Associates, revoking its registration and imposing a civil monetary

27

penalty, and censuring Sandeep Parikh and barring him from being an associated person of a registered public accounting firm for at least three years from the date thereof. According to the PCAOB, the reason for the disciplinary actions was the "numerous and repeated violations of PCAOB rules, quality control standards, and auditing standards" by the firm, with Sandeep Parikh at the helm.

> **E. After Pumping up the Stock Price, and Because the Company is Unable to Secure Traditional Financing, Cemtrex Uses Its Own Stock as Currency to Quickly Expand Operations**

88.    Prior to and through the Class Period, the Company was focused on expanding operations through the acquisition of other entities – mainly using Cemtrex's common stock to make the acquisition.

89.    As stated in the Company's Form 10-K filed with the SEC on January 13, 2010, the Company's acquisition of Griffin on April 30, 2007 was effected primarily through a stock issuance to Griffin's prior owner, *defendant* Arun Govil:

> On April 30, 2007, the Company purchased, though a business combination, all of the issued and outstanding membership interests of Griffin Filters LLC, ("Griffin") a company established since 1971 and engaged in the design, engineering & supplying of industrial air filtration equipment from its President. Arun Govil, the Chairman, Chief Executive Officer, Treasurer and President of the Company, was the owner of 100% of the issued and outstanding membership interests of Griffin. The Company purchased 100% ownership in Griffin for a purchase price of $2,750,000.00. The Company completed the Griffin purchase by (i) paying cash of $700,000; (ii) issuing 20,000,000 shares of common stock valued at $750,000; and (iii) issuing a four year convertible debenture in the amount of $1,300,000 (see Note 7). Griffin had sales and net income of $3,297,409 and $145,981 respectively for fiscal year ended September 30, 2006. Griffin is now a wholly-owned subsidiary of the Company.

90.    The $1.3 million convertible debenture held by Arun Govil was subsequently cancelled by agreement of the Company and Arun Govil and replaced by 2,500,000 shares of Cemtrex common stock and 1,000,000 shares of Cemtrex Series A Preferred Stock.

91.     Similarly, on October 31, 2013, the Company completed its acquisition of the

ROB Group, consisting of 4 operating companies in Germany. As stated by the Company in its

January 16, 2014 Form 10-K:

> The purchase price for ROB Group was Euro 4,200,000.00 (US$ 5,609,100 based
> upon exchange rate on October 31, 2013) with additional acquisition expenses of
> Euro 495,000 (US$ 661,073 based upon exchange rate on October 31,2013). The
> purchase was financed through a Euro 2,010,868.00 ( US$ 2,685,514 based upon
> exchange rate on October 31,2013) long term loan from Ducon Technologies
> Inc., a company controlled by Arun Govil, Chairman of the Cemtrex and a Euro
> 3.0 million (US$4,006,500 based upon exchange rate on October 31,2013) loan
> from Sparkasse Bank of Germany at 4.95% per annum payable on October 30,
> 2021 and another Euro 1.0 million ( US$1,335,500 based upon exchange rate on
> October 31,2013) overdraft credit facility from Sparkasse Bank of Germany at
> interest rate of 4.0% per annum payable on October 30, 2015.

92.     The reliance on an outside loan from Ducon and A. Govil was compounded by

the fact that the Company had nearly *no cash on hand*, reporting just $67,000 in cash on its

balance sheet for the year ended September 30, 2013.

93.     On December 15, 2015, the Company acquired Advanced Industrial Services, Inc.

("AIS"), an installer of high precision equipment in a wide variety of industrial markets such as

automotive, printing and graphics, industrial automation, packaging and chemicals, for a

purchase price of approximately $7.7 million. The purchase price was paid in the form of $5.2

million in cash (financed through a bank loan), $1.5 million in a seller note and $1.0 million

from the issuance of 315,458 shares of Cemtrex common stock.

94.      On May 31, 2016, Cemtrex acquired machinery and equipment, and the

electronics manufacturing and logistics businesses of Periscope, GmbH. The Periscope

acquisition was financed through $4,902,670 in cash, $717,936 in the form of a seller note and

$3,298,600 in proceeds from the issuance of a note to Ducon.

95.     Assets acquired from Periscope were organized into three new entities, each operating under the ROB Cemtrex GmbH umbrella in Germany: ROB Cemtrex Assets UG; ROB Cemtrex Automotive GmbH; and ROB Cemtrex Logistics GmbH.

96.     According to the Company's Form 10-K filed on December 13, 2017, the Company had determined to exchange the long-term debt owed to Ducon from its financing of Periscope for additional Cemtrex equity:

> The Company had notes payable to Ducon Technologies Inc., totaling $0 and $3,599,307 at September 30, 2017 and September 30, 2016, respectively. These notes were unsecured and carried 5% interest per annum. On February 9, 2017, the outstanding principal and accrued interest owed on the notes payable of $3,339,833 were exchanged for 333,983 shares of the Company's series 1 preferred stock and 667,967 series 1 warrants.

**1. Cemtrex Is Reliant on Using Its Common Stock as Currency and Related Party Debt Financing From Ducon Because It is Highly Leveraged, Unable to Secure Financing Through Traditional Means**

97.     Prior to and throughout the Class Period, Ducon acted as Cemtrex's safety blanket, whether it was through the asset sale of Ducon's MIP division to Cemtrex or the related transaction that saw the transfer of ownership of Griffin to the Company.  Further, as evidenced above, nearly every Cemtrex acquisition involved the use of funds from Ducon – funds that were then converted to Cemtrex equity.

98.     The reason for the Company's reliance on Ducon for its financing is because Cemtrex was otherwise ineligible to raise funds through an S-3 shelf registration and offering.

99.     Cemtrex attempted to do so on April 12, 2016, filing an S-3 registration statement with the SEC where the Company sought to offer $10 million in the aggregate of common stock, preferred stock, depository shares, debt securities, warrants, purchase contracts, and units.

100.     Unfortunately for Defendants, the SEC rejected the offering, sending a letter to the Company on May 9, 2016 that set forth **thirty-six** different concerns or questions the SEC

had with the S-3 registration statement and related SEC filings, including a request that the Company demonstrate that it meets the eligibility requirements to effectuate an S-3 offering, particularly because:

> (i) [Cemtrex's] definitive proxy statement, which includes the information required by Part III of Form 10-K, was not filed within 120 days of your fiscal-year-ended September 30, 2015; (ii) no Form 8-K was filed in relation to the meeting of shareholders held on March 7, 2016 (see Item 5.07 to Form 8-K); and (iii) several other reports filed during the preceding twelve calendar months appear to have been filed untimely. These include the Form 8-K/A filed April 15, 2015, the Form 8-K filed April 23, 2015, and the Form 8-K/A filed March 11, 2016. [The SEC] also note[d] the Form 8-K dated December 17, 2015 does not include any disclosure under or reference to Item 2.01 of that Form and no original report on Form 8-K was filed in relation to the matters referenced in the April 15, 2015 Form 8- K/A, just the amended version.

101.    Recognizing its efforts as futile, on May 17, 2016, Saagar Govil submitted a letter to the SEC on behalf of Cemtrex, requesting a withdrawal of the S-3 registration statement. Therein, Saagar Govil admitted that "[a]t this time, the Company has determined that it is unlikely that it will meet the eligibility requirements for use of the Registration Statement."  In the Company press release issued on May 20, 2016 announcing the registration statement withdrawal, Cemtrex stated, "The Company is still exploring traditional debt & equity financings to raise funds for planned acquisitions and to strengthen the Company's balance sheet."  In that same press release, Saagar Govil is quoted as stating, "As we grow revenues and the profitability of the Company, we become eligible for stronger, more traditional financing structures and thus can reward the owners of the Company's equity. We are taking the necessary steps to have attractive financing options in place for the future despite changing course from the S-3."

102.    The "attractive financing option" used to finance the Periscope acquisition turned out to be the nearly $3.4 million note to Ducon in May 2016 which would shortly thereafter be

exchanged for a combination of lucrative preferred stock and warrants for Ducon, as discussed *infra*.

### F. Defendants and Other Company Insiders Engage in Unreported Securities Transactions to Avoid Causing a Stock Decline That Would Prevent Cemtrex's Acquisitions

103.    Throughout the Class Period, each of the Individual Defendants transacted in Cemtrex securities without filing any of the required reports with the SEC, effectively masking from Lead Plaintiffs and the investing public these transactions, each of which was made with the benefit of undisclosed insider corporate knowledge.

104.    Pursuant to the federal securities laws and SEC regulations, corporate insiders – meaning a company's officers and directors, and any beneficial owners of more than ten percent of a class of the company's equity securities registered under Section 12 of the Securities Exchange Act of 1934 – must file with the SEC a statement of ownership regarding those securities.

105.    On May 13, 2008 Cemtrex filed with the SEC a Form 10 General Form for Registration of Securities seeking to register Cemtrex common stock pursuant to Section 12 of the Securities Exchange Act of 1934.   That registration became effective 60 days from the date of initial filing by operation of law.

106.    In the final amendment to the registration form filed by the Company on Form 10-12G/A with the SEC on November 25, 2008, Cemtrex set forth its purported insider ownership of common stock:

| Name and Address of Owner | Title | Amount Owned Before Offering | Percentage of Issued Common Stock [1] |
|---|---|---|---|
| Arun Govil<br>19 Engineers Lane<br>Farmingdale, New York 11735 | President ,Chief Executive Officer and Chairman of the Board | 55,430,000[2][3] | 86.2% |
| Renato Dela Rama<br>19 Engineers Lane<br>Farmingdale, New York 11735 | Vice President | 0 | 0 |
| Vandana Govil<br>19 Engineers Lane<br>Farmingdale, New York 11735 | Secretary, Director | 55,430,000[2][3][4] | 86.2% |
| All directors and executive officers as a group (3 persons) | | 55,430,000 | 86.2% |

107.    As discussed below, each of the Individual Defendants, along with other Company insiders, failed to timely file their SEC disclosure forms evidencing holdings and transactions in Cemtrex common stock, withholding from the market material information that would have otherwise informed the investment decisions of Lead Plaintiffs and non-insider investors.   The widespread practice in the face of a known requirement (as shown by the Company's affirmative and false 16(a) statement in its SEC filings and certain individuals' own belated disclosure filings) evidences an intentional decision to avoid disrupting the Company's common stock price, which was being actively inflated through Cemtrex's engagement of outside promoters and other materially false and misleading statements and omitted facts alleged herein.

### 1.   Arun Govil Fails to Timely Report His or Ducon's Insider Holdings and Transactions

108.    Despite federal law requiring such reporting, Defendant Arun Govil did not file his initial Form 3 with the SEC until March 14, 2011 -- *nearly two and a half years after the final registration statement amendment* (the "March 2011 Form 3").   Further, in addition to being the President, Chief Executive Officer and Chairman of the Board of Cemtrex as of the effective date of the Company's securities registration (requiring that he file a Form 3), Arun Govil also controlled more than 86% of Cemtrex's common stock as of December 15, 2008, as

reported in the Company's annual report filed on Form 10KSB filed with the SEC on January 13, 2009:

| Name and Address of Owner | Title | Amount Owned Before Offering | Percentage of Issued Common Stock [(1)] |
|---|---|---|---|
| Arun Govil<br>19 Engineers Lane<br>Farmingdale, New York 11735 | President ,Chief Executive Officer and Chairman of the Board | 55,430,000[(2)(3)] | 86.2% |
| Renato Dela Rama<br>19 Engineers Lane<br>Farmingdale, New York 11735 | Vice President | 0 | 0 |
| Vandana Govil<br>19 Engineers Lane<br>Farmingdale, New York 11735 | Secretary, Director | 55,430,000[(2)(3)(4)] | 86.2% |
| All directors and executive officers as a group (3 persons) | | 55,430,000 | 86.2% |

109.    The March 2011 Form 3 even admits that the date of event requiring the filing of the statement was November 25, 2008 and belatedly reported the holdings of Arun Govil and Ducon:

| 1. Name and Address of Reporting Person[*]<br>GOVIL ARUN<br><br>(Last)      (First)      (Middle)<br>19 ENGINEERS LANE<br><br>(Street)<br>FARMINGDALE NY          11735<br><br>(City)      (State)      (Zip) | 2. Date of Event Requiring Statement (Month/Day/Year)<br>11/25/2008 | 3. Issuer Name and Ticker or Trading Symbol<br>CEMTREX INC [ OTCQB: CTE ] | | |
|---|---|---|---|---|
| | | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable)<br>X   Director          10% Owner<br>X   Officer (give title      Other (specify<br>below)                below)<br>See Remarks | 5. If Amendment, Date of Original Filed (Month/Day/Year) | |
| | | | 6. Individual or Joint/Group Filing (Check Applicable Line)<br>X   Form filed by One Reporting Person<br>Form filed by More than One Reporting Person | |

| Table I - Non-Derivative Securities Beneficially Owned | | | |
|---|---|---|---|
| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
| Common Stock | 23,480,000 | D | |
| Common Stock | 1,950,000 | I | by Ducon Technologies Inc. |
| Series A Preferred Stock | 1,000,000 | D | |

| Table II - Derivative Securities Beneficially Owned<br>(e.g., puts, calls, warrants, options, convertible securities) | | | | | |
|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

110.    As set forth herein, Arun Govil has continuously held his position as a corporate insider and/or otherwise beneficially owned more than 10% of Cemtrex's common stock through

the present.   Thus, at all times relevant hereto, Arun Govil was subject to Section 16(a)'s reporting requirements.

111.   Despite taking this extended period of time to even file the report, Arun Govil then filed an amendment to the Form 3 on November 7, 2014 – ***nearly six years after the required reporting date***.  This amendment adjusted the amount of common stock purportedly directly owned by Arun Govil, reducing the number by 5,000,000 shares:

| 1. Name and Address of Reporting Person* | | | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name **and** Ticker or Trading Symbol | | |
|---|---|---|---|---|---|---|
| GOVIL ARON | | | 11/25/2008 | CEMTREX INC [ OTCQB:CTEI ] | | |
| | | | | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) | 5. If Amendment, Date of Original Filed (Month/Day/Year) | |
| (Last)        (First)        (Middle) | | | | X   Director             10% Owner | 03/14/2011 | |
| 19 ENGINEERS LANE | | | | X   Officer (give title below)    Other (specify below) | 6. Individual or Joint/Group Filing (Check Applicable Line) | |
| (Street) | | | | See Remarks | X   Form filed by One Reporting Person | |
| FARMINGDALE NY        11735 | | | | | Form filed by More than One Reporting Person | |
| (City)        (State)        (Zip) | | | | | | |

| Table I - Non-Derivative Securities Beneficially Owned | | | |
|---|---|---|---|
| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
| COMMON STOCK | 18,480,000 | D | |
| COMMON STOCK | 1,950,000 | I | BY DUCON TECHNOLOGIES |
| SERIES A PREFERRED STOCK | 1,000,000 | D | |

| Table II - Derivative Securities Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities) | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

112.   This amendment, however, rendered Arun Govil's holdings, as previously reported by the Company in its SEC filings, inaccurate and overstated by 5,000,000 shares, or more than 27%.  For example, in the annual report filed by Cemtrex on Form 10-K on December 26, 2012, the Company represented that Arun Govil's consisted of 25,430,000 shares (inclusive of the 1,950,000 shares reportedly held by Ducon).

113.    Arun Govil would continue to conceal his true holdings and transactions in his SEC filings, as he has since filed no Form 4s or amended Form 3s indicating changes in Cemtrex ownership, yet he appears to have been secretly liquidating his position and taking profits on the open market.  His actions are evidenced by a piecemeal view of the Company's SEC filings and the limited information Arun Govil has proffered.

114.    In April 2015, the Company effected its 6 for 1 reverse stock split.  As a result of the stock split, Arun Govil's holdings were purportedly reduced from 18,480,000 (as reported in the amended Form 3/A) to 3,080,000 shares.  Similarly, Ducon's purported holdings should have been reduced from 1,950,000 shares (as last reported on Form 3/A) to 325,000.

115.    On August 25, 2015, Arun Govil, on behalf of Ducon, belatedly filed a Form 4 reporting transactions for Ducon representing a purported acquisition of 11,100 shares of Cemtrex common stock.  This Form 4 was not filed within two business days as required by Section 16(a) and otherwise claimed that Ducon then beneficially owned 367,487 shares of Cemtrex common stock following the transaction:

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name and Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) | |
|---|---|---|---|---|---|
| DUCON TECHNOLOGIES, INC. | | | CEMTREX INC [ CETX ] | Director | 10% Owner |
| (Last)          (First)          (Middle) | | | 3. Date of Earliest Transaction (Month/Day/Year) 08/14/2015 | Officer (give title below)        X | Other (specify below) |
| 19 ENGINEERS LANE | | | | See remarks | |
| (Street) | | | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) | |
| FARMINGDALE NY          11735 | | | | X | Form filed by One Reporting Person |
| (City)          (State)          (Zip) | | | | | Form filed by More than One Reporting Person |

| Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/14/2015 | | P | | 11,100 | A | $2.56 | 367,487 | D | |

| Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | 6. Date Exercisable and Expiration Date (Month/Day/Year) | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

Explanation of Responses:

**Remarks:**
Related party company owned by 10% owner

/s/Aron Govil, on behalf of Ducon Technologies, Inc.     08/24/2015

** Signature of Reporting Person      Date

116.    Ducon's purported increase in holdings left 31,387 shares unaccounted for (367,487 *less* 325,000 *less* 11,100), or nearly 9% of Ducon's total holdings.

117.    On November 17, 2015, Arun Govil, on behalf of Ducon, filed a second and final Form 4 representing an additional purported acquisition of Cemtrex common stock.  Therein, Arun Govil claimed Ducon acquired an additional 65,732 shares, increasing its total holdings to 433,219 -- a purported purchase that coincides with the December 2015 acquisition of AIS by Cemtrex.  Additionally, the figures reported in the Form 4 continue to omit any mention of the more than 31,000 share gap in reported holdings:

| 1. Name and Address of Reporting Person* | | | 2. Issuer Name **and** Ticker or Trading Symbol<br>CEMTREX INC [ CETX ] | | | 5. Relationship of Reporting Person(s) to Issuer<br>(Check all applicable) | | |
|---|---|---|---|---|---|---|---|---|
| DUCON TECHNOLOGIES, INC. | | | | | | | Director | 10% Owner |
| (Last)          (First)          (Middle) | | | 3. Date of Earliest Transaction (Month/Day/Year)<br>11/13/2015 | | | | Officer (give title below) | X   Other (specify below) |
| 19 ENGINEERS LANE | | | | | | See Remarks | | |
| (Street)<br>FARMINGDALE NY          11735 | | | 4. If Amendment, Date of Original Filed (Month/Day/Year) | | | 6. Individual or Joint/Group Filing (Check Applicable Line) | | |
| | | | | | | X   Form filed by One Reporting Person | | |
| (City)          (State)          (Zip) | | | | | | Form filed by More than One Reporting Person | | |

**Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned**

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 11/13/2015 | | P | | 65,732 | A | $2.55 | 433,219 | D | |

**Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**
**Remarks:**
Related party company owned by 10% owner

/s/ Aron Govil, on behalf of
Ducon Technologies, Inc.          11/16/2015

** Signature of Reporting Person          Date

118.     On February 8, 2016, the Company filed with the SEC a proxy statement on Schedule 14A (the "February 2016 Proxy").  The February 2016 Proxy represented the first SEC filing by the Company following the reverse 6 for 1 stock split effected in April 2015 that set forth the beneficial ownership of Company insiders.  The February 2016 Proxy stated that Arun Govil owned 3,405,000 shares of common stock (or 42% of common stock issued at that point), inclusive of Ducon's holdings, which it does not separately list.

119.     However, accepting *arguendo* Ducon's then-most-recently Form 4 filing as accurate and assuming that that entity controlled 433,219 shares, then Arun Govil's personal holdings numbered 2,971,781 shares (3,405,000 *less* 433,219).

120.    As Arun Govil previously reported individual holdings of 18,480,000 shares (which were then reduced by a factor of 6 in the reverse stock split to 3,080,000), Arun Govil appears to have failed to report the sale of 108,219 shares (3,405,000 *less* 2,971,781).

121.    In a Proxy Statement filed by the Company with the SEC on January 30, 2017 (the "January 2017 Proxy"), the Company represented that Arun Govil owned 3,182,951 shares of common stock, inclusive of 102,951 shares owned by Ducon – the first time the Company expressly set forth what percentage of Arun Govil's holdings were attributed to Ducon.

122.    Assuming the January 2017 Proxy Statement is correct (which Lead Plaintiffs do not believe is accurate), then as of that period, Arun Govil individually owned 3,080,000 shares. However, accepting these figures as true means that Ducon failed to report the sale of 330,268 shares of Cemtrex common stock (433,219 shares reported on Ducon's final Form 4 *less* 102,951 shares reported in the January 2017 Proxy) – ***or more than 76% of Ducon's total holdings***.

123.    Ducon purportedly filed a Form 144 with the SEC indicating a notice of proposed sale of securities pursuant to Rule 144 under the Securities Act of 1933.  This Form 144 was purportedly signed on September 12, 2016 and submitted to the SEC Mail processing Section on September 27, 2016 and shows Ducon's intention to sell 325,001 shares of Cemtrex common stock through an E-Trade broker.  However, no Form 4 evidencing the actual sale of these securities was ever filed:

FORM 144 — NOTICE OF PROPOSED SALE OF SECURITIES PURSUANT TO RULE 144 UNDER THE SECURITIES ACT OF 1933

Name of Issuer: Cemtrex Inc.
IRS Ident. No.: 300399914   S.E.C. File No.: 0001435064
Address of Issuer: 19 Engineers Lane, Farmingdale, NY 11735-   Telephone: 631 756-9116
Name of Person for Whose Account the Securities Are to Be Sold: Ducon Technologies Inc.
Relationship to Issuer: Insider   Address: 19 Engineers Lane, Farmingdale NY 11735

| Title of Class | Broker / Market Maker | Number of Shares To Be Sold | Aggregate Market Value | Number of Shares Outstanding | Approximate Date of Sale | Name of Each Securities Exchange |
|---|---|---|---|---|---|---|
| Common | E-Trade | 325,001 | | 9,410,947 | | NASDAQ CM |

124.    As such, while S. Govil would later point to this Form 144 as proof of disclosure of Ducon's sale of Cemtrex equity, he fails to address the fact that such sale was not reported on Form 4 and that a Form 144 only evidences *intent*.  By the end of the Class Period, and as it stands today, it is entirely unclear when or at what price these hundreds of thousands of shares were sold by Ducon, making it impossible to determine the true financial benefit that flowed through to A. Govil – a concern compounded by the fact that in October 2016, just weeks after A. Govil's submission of the Form 144, he, through Southern Steel, paid $30,000 for a stock promotion campaign to inflate Cemtrex's stock price.

40

### 2. Saagar Govil Fails to Timely Report His Cemtrex Holdings and Transactions

125.    On March 23, 2011, Saagar Govil belatedly filed his initial Form 3 reporting his interest in Cemtrex common stock.  This Form 3 states that the Saagar Govil came to acquire his 3,000,000 shares of Cemtrex common stock in October 2010, yet the Form 3 was not filed until nearly 6 months later:

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name **and** Ticker or Trading Symbol |
|---|---|---|
| GOVIL SAAGAR | | CEMTREX INC [ OTCQB:CTEI ] |

| 1. Name and Address of Reporting Person* | 2. Date of Event Requiring Statement | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) | 5. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|---|---|---|
| (Last)   (First)   (Middle) | 10/04/2010 | X  Director          10% Owner | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| 19 ENGINEERS LANE | | X  Officer (give title below)   Other (specify below) | X  Form filed by One Reporting Person |
| (Street) | | | Form filed by More than One Reporting Person |
| FARMINGDALE NY     11735 | | Secretary and Director | |
| (City)   (State)   (Zip) | | | |

| Table I - Non-Derivative Securities Beneficially Owned | | | |
|---|---|---|---|
| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
| Common Stock | 3,000,000 | D | |

| Table II - Derivative Securities Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities) | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

Explanation of Responses:

/s/ Saagar Govil          03/22/2011
** Signature of Reporting Person      Date

126.    According to the Company's annual report filed on Form 10-K on January 14, 2011, for the fiscal year ended September 30, 2010, Saagar Govil was listed as one of the Company's directors and thus, was required to file the necessary reporting under Section 16(a):

| Name and Address | Age | Positions and Offices |
|---|---|---|
| Arun Govil<br>19 Engineers Lane<br>Farmingdale, New York 11735 | 55 | President, Chief Executive Officer, Treasurer, and Chairman of the Board of Directors |
| Renato Dela Rama<br>19 Engineers Lane<br>Farmingdale, New York 11735 | 62 | Vice President of Finance and Director |
| Ravi Narayan<br>19 Engineers Lane<br>Farmingdale, New York 11735 | 51 | Vice President of MIP Division and Director |
| Saagar Govil<br>19 Engineers Lane<br>Farmingdale, New York 11735 | 24 | Director |

127.    The Company went reported Saagar Govil's 3,000,000 share holding in its annual report on Form 10-K filed on December 26, 2012 and in the amendment thereto filed on January 3, 2013.

128.    Misinformation about Saagar Govil's holdings would infect the Company's SEC filings, with Cemtrex reporting in its annual report on Form 10-K filed with the SEC on January 16, 2014 that Saagar Govil's holdings totaled 8,000,000 shares, a representation that was repeated in the amendments to the annual report filed on June 13, 2014 and September 26, 2014:

| Title of Class | Name and Address of Holder | Title | Amount Owned | Percentage of Issued Stock (1) |
|---|---|---|---|---|
| Common Stock | Arun Govil 19 Engineers lane Farmingdale, NY 11735 | Chairman of the Board | 20,430,000 (2) (3) | 50.3 |
| Preferred Stock | Arun Govil 19 Engineers lane Farmingdale, NY 11735 | Chairman of the Board | 1,000,000 (2) | |
| Common Stock | Saagar Govil 19 Engineers lane Farmingdale, NY 11735 | Chief Executive Officer | 8,000,000 | 19.7 |
| Common Stock | Ravi Narayan 19 Engineers lane Farmingdale, NY 11735 | Vice President & Director | 800,000 | 2.0 |
| Common Stock | Renato Dela Rama 19 Engineers lane Farmingdale, NY 11735 | Chief Financial Officer & Director | 400,000 | 1.0 |
| | All directors and executive officers as a group (4 persons) | | 29,630,000 | 73.0 |

129.    However, despite the Company's best efforts to make it appear that Saagar Govil had more than doubled his holdings in Cemtrex common stock from 3,000,000 to 8,000,000 on the open market, Saagar Govil filed an amendment to his Form 3 on November 10, 2014 purportedly correcting his ownership interest and stating that he had actually owned 8,000,000 shares since November 25, 2008:



130.    Accepting this corrected Form 3/A as true, Saagar Govil's 8,000,000 shares represented 12.4% of Cemtrex's common stock outstanding as of December 15, 2008 (as reported in the Company's Form 10KSB filed on January 13, 2009).  Thus, upon his acquisition of these shares in November 2008 making him a greater than 10% owner of the Company, Saagar Govil was immediately required to comply with the reporting requirements of Section 16(a) despite not yet being a director of the Company – a requirement with which he failed to comply.

131.    Saagar Govil then subsequently went radio silent as to any Cemtrex transactions, failing to make any Form 4 report until March 2017 despite purportedly engaging in several transactions in the interim period.

132.    On March 6, 2017, Saagar Govil again amended his Form 3, this time to purportedly account for the 6 for 1 reverse stock split from April 2015.  However, the Form 3/A claims that Saagar Govil's total share count was 1,337,888, an amount that is incongruous with his prior SEC filings and purported ownership (8,000,000 shares *divided by* 6 to account for the stock split *equals* 1,333,333):



133.    Also on March 6, 2017, Saagar Govil submitted a belated Form 4 for eight transactions that took place between February 2013 and February 2017:

| Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b). | STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP | | Estimated average burden hours per response:   0.5 |
|---|---|---|---|

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| GOVIL SAAGAR | CEMTREX INC [ CETX ] | Director                          10% Owner |
| | 3. Date of Earliest Transaction (Month/Day/Year) | X  Officer (give title below)   Other (specify below) |
| (Last)      (First)      (Middle) | 02/28/2013 | |
| 19 ENGINEERS LANE | | Chairman, CEO and President |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| FARMINGDALE NY          11735 | | X  Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | Form filed by More than One Reporting Person |

| Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock(2) | 02/28/2013 | | P | | 1,667 | A | $0.77 | 1,339,555 | D | |
| Common Stock(2) | 06/25/2014 | | P | | 350 | A | $5.96 | 1,339,905 | D | |
| Common Stock(2) | 04/07/2015 | | P | | 17 | A | $2.85 | 1,339,922 | D | |
| Common Stock | 05/12/2015 | | P | | 50 | A | $3.9 | 1,339,972 | D | |
| Common Stock | 02/27/2017 | | P | | 1,000 | A | $3.8 | 1,340,972 | D | |
| Common Stock | 02/28/2017 | | P | | 1,000 | A | $3.71 | 1,341,972 | D | |
| Common Stock | 02/28/2017 | | P | | 3,000 | A | $3.72 | 1,344,972 | D | |
| Common Stock | 02/28/2017 | | P | | 1,000 | A | $3.7 | 1,345,972 | D | |

134.    None of these transactions were timely reported pursuant to Section 16(a).

135.    On November 13, 2014 the Company filed a proxy statement (the "November 2014 Proxy") stating that as of October 30, 2013, Saagar Govil controlled 8,000,000 shares of Company common stock.

136.    This 8,000,000 shares would have been reduced in the reverse stock split to 1,333,333 shares.  However, the purportedly corrected Form 3/A from March 6, 2017 claims that Saagar Govil instead held 1,337,888 as a result of the reverse.  This figure serves as the basis for the share count reported on the Form 4 also filed on March 6, 2017.

137.    The March 6, 2017 Form 4 also confirmed the falsity of the stock holdings reported in several Company SEC filings.  For example, on February 08, 2016, the Company filed a proxy statement that stated as of January 27, 2016, Saagar Govil held 1,333,334 shares.

46

138.    However, if Saagar Govil's March 6, 2017 Form 4 is to be believed, then as of January 27, 2016, Saagar Govil actually held 1,339,972 shares.

139.    Similarly, on January 30, 2017, the Company filed a proxy statement that stated, as of January 13, 2017, Saagar Govil held 1,433,334.  Yet according to the March 6, 2017 Form 4, as of January 13, 2017, Saagar Govil actually controlled 1,339,972 shares. Thus, when accounting for the 100,000 shares subject to stock options vesting and exercisable as of February 12, 2017, Saagar Govil's reportable holdings should have been 1,439,972.

### 3.  Renato Dela Rama Fails to Timely Report his Cemtrex Holdings and Transactions

140.    Prior to and throughout the Class Period, Defendant Dela Rama and the Company hid from the market a rash of Company stock sales that saw him liquidate nearly 20% of his entire holdings.

141.    At all times relevant hereto, Dela Rama was required to file the necessary disclosures pursuant to Section 16(a).  For example, beginning with the Company's May 14, 2008 registration statement, Dela Rama was listed as a Company officer, purportedly holding the position of Vice President of Finance.

142.    Further, on January 13, 2010, the Company filed an annual report on Form 10-K that presented Dela Rama as a Company director in addition to being a Cemtrex Vice President.

143.    Further, as stated in the proxy statement filed by the Company on January 30, 2017 defendant Dela Rama "has been [Cemtrex's] Vice president of Finance since December 2004."

144.    Thus, at all times relevant hereto, Dela Rama was subject to Section 16(a)'s reporting requirements.

145.    On April 22, 2011, Dela Rama filed his Form 3, indicating ownership of 400,000 shares of Company common stock:

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* <br><br> DELA RAMA REHATO <br><br> (Last) (First) (Middle) <br> 19 ENGINEERS LANE <br><br> (Street) <br> FARMINGDALE NY     11735 <br><br> (City)   (State)   (Zip) | 2. Date of Event Requiring Statement (Month/Day/Year) <br> 11/25/2008 | 3. Issuer Name and Ticker or Trading Symbol <br> CEMTREX INC [ OTCQB: CTE ] |  |
|---|---|---|---|
|  |  | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br><br> X   Director          10% Owner <br> X   Officer (give title     Other (specify <br>      below)          below) <br><br>      Vice President and Director | 5. If Amendment, Date of Original Filed (Month/Day/Year) <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X   Form filed by One Reporting Person <br>     Form filed by More than One Reporting Person |

| Table I - Non-Derivative Securities Beneficially Owned | | | |
|---|---|---|---|
| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
| Common Stock | 400,000 | D | |

| Table II - Derivative Securities Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities) | | | | | | |
|---|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|  | Date Exercisable | Expiration Date | Title | Amount or Number of Shares |  |  |  |

Explanation of Responses:

/s/ Dela Rama Rehato        03/22/2011
** Signature of Reporting Person        Date

146.    Therein, Dela Rama indicated a date of event requiring reporting as November 28, 2008, an implicit admission that he was in violation of Section 16(a)'s reporting requirements.

147.    Incredibly, this initial Form 3 also misspelled defendant Dela Rama's first name as "Rehato" – a correction that was subsequently made on Form 3/A on November 10, 2014 – *three and a half years later*:

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name **and** Ticker or Trading Symbol |
|---|---|---|
| DELA RAMA RENATO | 11/25/2008 | CEMTREX INC [ OTCQB:CTEI ] |

| (Last)      (First)      (Middle) | | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) | 5. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|---|---|---|
| 19 ENGINEERS LANE | | X  Director     10% Owner | 03/22/2011 |
| (Street) | | X  Officer (give title below)    Other (specify below) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| FARMINGDALE NY      11735 | | VICE PRESIDENT AND DIRECTOR | X  Form filed by One Reporting Person |
| (City)      (State)      (Zip) | | | Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Beneficially Owned**

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| COMMON STOCK | 400,000 | D | |

**Table II - Derivative Securities Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

Explanation of Responses:
**Remarks:**
AMENDED TO CORRECT INACCURATE INFORMATION ON ORIGINAL

| /s/ Renato Dela Rama | 11/07/2014 |
|---|---|
| ** Signature of Reporting Person | Date |

148.    The Company would report Dela Rama's holdings as 400,000 shares from 2012 through 2014, beginning with the annual report filed on Form 10-K by Cemtrex on December 23, 2012 and concluding with the Proxy Statement filed by the Company on November 13, 2014.

149.    On February 8, 2016, the Company filed the February 2016 Proxy which stated Dela Rama's holdings as of January 27, 2016 were 66,667 shares (400,000 *divided by* 6 for the reverse stock split).

150.    However, as would only come to light in March 2017, by that point Renato Dela Rama had engaged in several sales of Company common stock that actually saw his holdings dwindle to approximately 54,000, a number that would drop down to less than 47,000 shares by July 2016:

Instruction 1(b).

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Issuer Name **and** Ticker or Trading Symbol | 5. Relationship of Reporting Person(s) to Issuer (Check all applicable) |
|---|---|---|
| Rama Renato Dela | CEMTREX INC [ CETX ] | Director / 10% Owner |
| (Last)   (First)   (Middle) | 3. Date of Earliest Transaction (Month/Day/Year) | X Officer (give title below) / Other (specify below) |
| 19 ENGINEERS LANE | 03/30/2015 | VP of Finance /CFO |
| (Street) | 4. If Amendment, Date of Original Filed (Month/Day/Year) | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| FARMINGDALE NY   11735 | | X Form filed by One Reporting Person |
| (City)   (State)   (Zip) | | Form filed by More than One Reporting Person |

| Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|  |  |  | Code | V | Amount | (A) or (D) | Price |  |  |  |
| Common Stock | 03/30/2015 | | S | | 667 | D | $3.3 | 66,000 | D | |
| Common Stock | 04/13/2015 | | S | | 83 | D | $2.65 | 65,917 | D | |
| Common Stock | 04/13/2015 | | S | | 550 | D | $2.7 | 65,367 | D | |
| Common Stock | 04/14/2015 | | S | | 200 | D | $2.7 | 65,167 | D | |
| Common Stock | 04/14/2015 | | S | | 1,000 | D | $3 | 64,167 | D | |
| Common Stock | 04/14/2015 | | S | | 833 | D | $3.36 | 63,334 | D | |
| Common Stock | 06/24/2015 | | P | | 500 | A | $3.75 | 63,834 | D | |
| Common Stock | 06/29/2015 | | G | | 1,500 | D | $0 | 62,334 | D | |
| Common Stock | 06/29/2015 | | G | | 1,500 | D | $0 | 60,834 | D | |
| Common Stock | 06/29/2015 | | G | | 1,500 | D | $0 | 59,334 | D | |
| Common Stock | 09/22/2015 | | S | | 5,000 | D | $4.5 | 54,334 | D | |
| Common Stock | 06/07/2016 | | S | | 5,000 | D | $3.5 | 49,334 | D | |
| Common Stock | 07/12/2016 | | S | | 2,500 | D | $4.5 | 46,834 | D | |

| Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | 6. Date Exercisable and Expiration Date (Month/Day/Year) | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|  |  |  |  | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares |  |  |  |  |

Explanation of Responses:

Remarks:

On April 15, 2015 a 6-for-1 reverse stock split became effective. Stock amounts and per share pricing have been adjusted to after the reverse stock split became effective.

/s/ Renato Dela Rama    03/03/2017

** Signature of Reporting Person    Date

151.   This March 3, 2017 Form 4 finally disclosed 13 separate transactions that were hidden from Lead Plaintiffs and the market and which went unreflected in Cemtrex's own SEC filings.

152.    Instead, the Company followed up the February 2016 Proxy with the January

2017 Proxy which represented Dela Rama's holdings as 46,834:

| Title of Class | Name and Address of Beneficial Owner | Title | Amount Owned | Percentage of Issued Common Stock (1) | Percentage of voting stock (2) |
|---|---|---|---|---|---|
| Common Stock | Aron Govil 19 Engineers Lane Farmingdale, NY 11735 | Executive Director | 3,182,951(3), (4) | 32% | 15.8% |
| Preferred Stock | Aron Govil 19 Engineers Lane Farmingdale, NY 11735 | Executive Director | 1,000,000(3) (10,096,582 voting shares) | — | 50.2% |
| Common Stock | Saagar Govil 19 Engineers Lane Farmingdale, NY 11735 | Chairman of the Board, Chief Executive Officer, and President | 1,433,334 | 14% | 7.1% |
| Common Stock | Renato Dela Rama 19 Engineers Lane Farmingdale, NY 11735 | Vice President of Finance, Secretary | 46,834 | * | * |
| Common Stock | Sunny Patel 19 Engineers Lane Farmingdale, NY 11735 | Director | 6,722 | * | * |
| Common Stock | Shamik Shah 19 Engineers Lane Farmingdale, NY 11735 | Director | 5,417 | * | * |
| | | All directors and executive officers as a group (4 persons) | 4,675,258(5) | 47% | 73.5% |

153.    Thus, by virtue of the Company's SEC filings and the lack of proper Form 4

filings by Dela Rama, Lead Plaintiffs and investors were led to believe that Dela Rama had

liquidated the approximately 20,000 difference in shares in the year since the February 2016

Proxy.  In actuality, the bulk of those sales pre-dated the February 2016 proxy, with Dela Rama

selling an additional 7,500 shares between June and July 2016, sales that were also unreported to

Company stockholders and the investing public.

### 4.  Other Company Directors Fail to Timely Report their Cemtrex Holdings

154.    The failure to comply with Section 16(a) disclosure requirements was pervasive

amongst Cemtrex directors.

155.     As reported by the Company in its annual report on Form 10-K filed on January 13, 2010, the Company's board of directors to that point included Ravi Narayan, who was also the Vice President of Cemtrex's MIP Division.

156.     Further, as reported by the Company in its proxy statement filed on November 13, 2014, "Ravi Narayan has been with the Company since 2002 as general manager. In 2009 he became Vice president of the Company and a Director."

157.     Ravi Narayan would continuously act as a director of the Company from his appointment in 2009 until his resignation from the Board in April 2015, as announced by the Company in an April 23, 2015 press release announcing the appointment of Raju Panjwani and Sunny Patel to the Board, effective immediately, along with the resignations of Narayan and Dela Rama from the Board.

158.     Despite being required to file a Form 3 Initial Report pursuant to Section 16(a) within ten days of becoming a Cemtrex director, Ravi Narayan did not file his Form 3 until November 14, 2014 – *more than five years after his appointment*:

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* | 2. Date of Event Requiring Statement (Month/Day/Year) | 3. Issuer Name and Ticker or Trading Symbol |
|---|---|---|
| NARAYAN RAVI | 11/25/2008 | CEMTREX INC [ OTCBQ:CTEI ] |

| (Last)          (First)          (Middle) | | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) | | 5. If Amendment, Date of Original Filed (Month/Day/Year) |
|---|---|---|---|---|
| 19 ENGINEERS LANE | | X   Director         10% Owner | | |
| (Street) | | X   Officer (give title below)     Other (specify below) | | 6. Individual or Joint/Group Filing (Check Applicable Line) |
| FARMINGDALE NY        11735 | | VICE PRESIDENT AND DIRECTOR | | X   Form filed by One Reporting Person |
| (City)          (State)          (Zip) | | | | Form filed by More than One Reporting Person |

### Table I - Non-Derivative Securities Beneficially Owned

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| COMMON STOCK | 800,000 | D | |

### Table II - Derivative Securities Beneficially Owned
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

Explanation of Responses:

Ravi Narayan                    11/07/2014
** Signature of Reporting Person        Date

159.     Sunny Patel was appointed a director of the Company in April 2015, as announced by the Company in its April 23, 2015 press release.

160.     Even if Sunny Patel held no shares of Company common stock upon his appointment to the Company's Board, he was required under Section 16(a) to file a Form 3 as he was then a mandatory reporting individual.

161.     In its proxy statement filed with the SEC on January 30, 2017, the Company reported common stock ownership by Sunny Patel of 6,722 shares:

| Title of Class | Name and Address of Beneficial Owner | Title | Amount Owned | Percentage of Issued Common Stock (1) | Percentage of voting stock (2) |
|---|---|---|---|---|---|
| Common Stock | Aron Govil<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Executive Director | 3,182,951(3), (4) | 32% | 15.8% |
| Preferred Stock | Aron Govil<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Executive Director | 1,000,000(3)<br>(10,096,582<br>voting<br>shares) | — | 50.2% |
| Common Stock | Saagar Govil<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Chairman of the Board,<br>Chief Executive Officer,<br>and President | 1,433,334 | 14% | 7.1% |
| Common Stock | Renato Dela Rama<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Vice President of Finance,<br>Secretary | 46,834 | * | * |
| Common Stock | Sunny Patel<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Director | 6,722 | * | * |
| Common Stock | Shamik Shah<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Director | 5,417 | * | * |
| | | All directors and executive<br>officers<br>  as a group (4 persons) | 4,675,258(5) | 47% | 73.5% |

162.     As the Company reported no ownership by Patel in any of its prior SEC filings, it can be inferred that Patel came to own these shares following his appointment to the Cemtrex Board.

163.     However, Patel has not filed any Form 4 evidencing this acquisition.

164.     Further, Patel has only filed a single Form 3, filed on March 7, 2017 – **_nearly two years after becoming a Company Director and in direct violation of the time period prescribed by Section 16(a)_**:

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934<br>or Section 30(h) of the Investment Company Act of 1940

| 1. Name and Address of Reporting Person* <br> **PATEL SUNNY** <br><br> (Last)    (First)    (Middle) <br> **19 ENGINEERS LANE** <br><br> (Street) <br> **FARMINGDALE NY      11730** <br><br> (City)    (State)    (Zip) | 2. Date of Event Requiring Statement (Month/Day/Year) <br> **04/22/2015** | 3. Issuer Name **and** Ticker or Trading Symbol <br> **CEMTREX INC** [ **CETX** ] |
|---|---|---|

4. Relationship of Reporting Person(s) to Issuer (Check all applicable)
X Director   10% Owner
Officer (give title below)   Other (specify below)

5. If Amendment, Date of Original Filed (Month/Day/Year)

6. Individual or Joint/Group Filing (Check Applicable Line)
X Form filed by One Reporting Person
Form filed by More than One Reporting Person

**Table I - Non-Derivative Securities Beneficially Owned**

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|
| Common Stock | 6,722 | D | |

**Table II - Derivative Securities Beneficially Owned**
(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable / Expiration Date | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) Title / Amount or Number of Shares | 4. Conversion or Exercise Price of Derivative | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|

Explanation of Responses:

/s/ Sunny Patel      03/07/2017
** Signature of Reporting Person      Date

165. Also on April 22, 2015, Raju Panjwani was appointed a director of the Company, joining the Board as part of the effort to create a majority independent board to comply with Nasdaq listing requirements.

166. Panjwani has remained a director of the Company continuously since his appointment.

167. However, despite being required to file a Form 3 initial report of equity interest in the Company, even if he has no holdings, pursuant to Section 16(a), Panjwani has made no such report with the SEC.

168. Shamik Shah was appointed to the Cemtrex Board on May 12, 2015; a position he continuously held until his resignation on February 9, 2018.

55

169.    Despite joining the Board, and thus becoming a mandated reporter of insider transactions pursuant to Section 16(a), Shah did not file a Form 3 until approximately two years later, when on March 7, 2017 Shah reported holdings of 5,417 shares:

| | | |
|---|---|---|
| Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 or Section 30(h) of the Investment Company Act of 1940 | | |

| 1. Name and Address of Reporting Person* <br><br> Shah Shamik <br><br> (Last)      (First)      (Middle) <br> 19 ENGINEERS LANE <br><br> (Street) <br> FARMINGDALE NY      11730 <br><br> (City)      (State)      (Zip) | 2. Date of Event Requiring Statement (Month/Day/Year) <br> 05/12/2015 | 3. Issuer Name and Ticker or Trading Symbol <br> CEMTREX INC [ CETX ] | 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br> X   Director          10% Owner <br>     Officer (give title   Other (specify <br>     below)            below) | 5. If Amendment, Date of Original Filed (Month/Day/Year) <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X   Form filed by One Reporting Person <br>     Form filed by More than One Reporting Person |

| Table I - Non-Derivative Securities Beneficially Owned | | | |
|---|---|---|---|
| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
| Common Stock | 5,417 | D | |

| Table II - Derivative Securities Beneficially Owned <br> (e.g., puts, calls, warrants, options, convertible securities) | | | | | | |
|---|---|---|---|---|---|---|
| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

Explanation of Responses:

/s/ Shamik Shah                    03/07/2017
** Signature of Reporting Person      Date

170.    Further, the February 2016 Proxy Statement omits any reference to either Shah or Patel's holdings in the Company, a disclosure that then changes with the January 2017 Proxy Statement:

| Title of Class | Name and Address of Beneficial Owner | Title | Amount Owned | Percentage of Issued Common Stock (1) | Percentage of voting stock (2) |
|---|---|---|---|---|---|
| Common Stock | Aron Govil<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Executive Director | 3,182,951(3), (4) | 32% | 15.8% |
| Preferred Stock | Aron Govil<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Executive Director | 1,000,000(3)<br>(10,096,582<br>voting<br>shares) | — | 50.2% |
| Common Stock | Saagar Govil<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Chairman of the Board, Chief Executive Officer, and President | 1,433,334 | 14% | 7.1% |
| Common Stock | Renato Dela Rama<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Vice President of Finance, Secretary | 46,834 | * | * |
| Common Stock | Sunny Patel<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Director | 6,722 | * | * |
| Common Stock | Shamik Shah<br>19 Engineers Lane<br>Farmingdale, NY 11735 | Director | 5,417 | * | * |
| | | All directors and executive officers<br>as a group (4 persons) | 4,675,258(5) | 47% | 73.5% |

171.   Thus, it can be inferred that both Patel's and Shah's acquisitions occurred between February 2016 and January 2017, yet no Form 4 was ever filed by either to represent such transactions.

172.   To the extent that Shah's securities holdings are attributable to the Series 1 preferred Stock and Series 1 warrants purchased as part of a unit under Cemtrex's January 2017 Rights Offering, Shah's reporting of this transaction was untimely as no Form 4 was filed to evidence this transaction until March 7, 2017.

173.   Thus, as evidenced by the myriad examples set forth herein, Cemtrex cultivated a culture of disregard for Section 16 reporting requirements and instead actively misrepresented insider holdings in the Company's SEC filings and its insiders' compliance, as alleged *infra*, in order to artificially bolster the Company's common stock price to better position the Company to carry out its needed acquisitions in the face of its inability to secure tradition financing.

**G. Defendants Tout the Company's EMS Automotive Segment Despite its Ongoing Troubles to Bolster Cemtrex's Upcoming Rights Offering**

174.   According to Defendants, one of the crown jewels of the Periscope acquisition was the addition of an automotive-focused electronics line to the Company's German-based EMS Segment.

175.   On September 8, 2016, the Company issued a press release titled "Cemtrex Provides Update on Recent Acquisition of Periscope."   Therein, the Company claimed that it "has fully integrated its recent acquisition of Periscope, an electronics manufacturing company located in Paderborn, Northwestern Germany . . . now operating as ROB Cemtrex Automotive GmbH."  As for the future of ROB Cemtrex Automotive GmbH, this press release forecasted the new subsidiary adding an additional $33 million in revenue over the next twelve months.

176.   On December 13, 2016 at 9:00 am ET, the Company issued a press release titled "Cemtrex Outlines Opportunities in the Automotive Electronics Space."

177.   Therein, the Company presented itself as being on the forefront of an automotive industry poised for a boom:

FARMINGDALE, N.Y., Dec. 13, 2016 /PRNewswire/ -- Cemtrex Inc. (Nasdaq: CETX), a world-leading industrial and manufacturing solutions company, commented today on the outlook for the Automotive Electronics industry and potential opportunities for the Company, as automobiles add more electronic components and as they become more connected. A recent report by Mckinsey indicates, "the dramatic increase in vehicle connectivity will increase the value of the global market for connectivity components and services to €170 billion by 2020 from just €30 billion today."

As the automotive industry also moves toward self-driving technology and connected intelligent cars, it is expected to generate new opportunities for Cemtrex. Companies like Hyundai and Volkswagen are working on connected car technologies and related services such as smartphone and smart home connected services, intelligent remote support, fully autonomous driving, smart traffic functionality and mobility hubs as part of their effort to establish a presence in the market. Technology companies such as Alphabet and Apple and automobile manufacturers including Ford, Volvo, Tesla, and BMW are investing in autonomous driving technology which requires the integration of many electronic

58

components and assemblies. According to a recent report from PwC, autonomous vehicles could come to full fruition in ten years which will enable new levels of connectivity and services both inside and outside the car. They estimate connected car revenues to increase from approximately $50 billion to $155.9 billion by 2022.

Cemtrex's chairman and CEO, Saagar Govil, commented: "Samsung Electronics recently acquired Harman International Industries, one of our largest customers, in an effort to accelerate its growth in the automotive connected space, which we believe is further validation of our strategy in this sector. We are extremely optimistic about the opportunities in front of us and our ability to leverage them with our growing organization."

178.    The timing of the Company's announcements was not a coincidence, as the Company had filed an S-1 Registration Statement with the SEC on August 29, 2016 related to its warrants and preferred shares rights offering, which was declared effective on December 12, 2016.  Unable to secure financing from traditional sources, the Company desperately needed the capital infusion provided by the rights offering.

179.    Contrary to Defendants' false and misleading public statements, the prospects for ROB Cemtrex Automotive GmbH were non-existent, as the Company immediately saw month-after-month decreasing sales and new orders that would eventually lead to the shutting down of the Paderborn, German facility and the laying off of hundreds of employees shortly after the acquisition.

> **H.  The Company Pays Peanuts to a Do-Nothing Audit Firm to Look the Other Way While the Individual Defendants Conceal Facts Related to Insiders' Reporting Compliance and Actively Misrepresent Facts Related to the Company's Purported Indian Subsidiary and German Automotive Business**

180.    On February 13, 2014, Cemtrex filed with the SEC a Form 8-K announcing the February 10, 2014 Board approval of the engagement of Bharat Parikh & Associates ("BPA") as the Company's principal independent registered accountant, ending the engagement with the Company's prior auditor, Li & Company, as of that same date.

181.    On December 29, 2014, BPA's first audit report was included in the Annual Report on Form 10-K filed by the Company with the SEC for the fiscal year ended September 30, 2014 (the "2014 Form 10-K") where BPA purported to have "conducted [its] audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).

182.    Per the Proxy Statement filed on Schedule 14 by the Company with the SEC on November 13, 2014, the Company paid just $15,000 to BPA in audit fees for 2014.

183.    On December 21, 2015, BPA's audit report was included in the Company's annual report filed on Form 10-K for the fiscal year ended September 30, 2015 (the "2015 Form 10-K"), which again claimed that the audit was carried out "in accordance with the standards of the Public Company Accounting Oversight Board (United States)."

184.    For its efforts, BPA was compensated a mere $20,000 in audit fees, as reported by the Company in the proxy statement filed on Schedule 14A with the SEC on February 8, 2016.

185.    On December 28, 2016, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended September 30, 2016 (the "2016 Form 10-K") which included BPA's audit report conducted pursuant to the standards of the PCAOB.

186.    As disclosed by the Company in its proxy statement filed on Schedule 14A with the SEC on January 30, 2017, the Company paid BPA $21,750 in audit fees for 2016.

187.    Importantly, the amount paid to BPA in 2016 for auditing the entire Company was *less than the amount paid to certain auditors for services performed in connection with Cemtrex's loan covenants*.  As stated in the 2017 proxy statement:

> The Company's subsidiary Advanced Industrial Systems was audited by Stambaugh Ness P.C., as per loan covenants of Fulton Bank for fiscal year 2016 and the Company incurred audit fees of $26,000.00. The Company's subsidiary ROB Cemtrex GmbH was audited by Dhmp GmbH & Co as per loan covenants

of Sparkasse Bank for fiscal year 2016 and company incurred audit fees of $28,600.00.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.   Cemtrex Materially Misrepresents Its Ownership Interest In An Indian Subsidiary To Make The Company Appear Legitimate

188.    As alleged *supra*, beginning on December 21, 2015 when the Company filed its Annual Report on Form 10-K for the fiscal year ended September 30, 2015, as signed by defendants A. Govil, S. Govil, Dela Rama, and the other members of Cemtrex's Board, the Company materially misrepresented its ownership interest in Cemtrex India, claiming 100% ownership.  This false statement would also appear in the Amended Form 10-K filed by the Company on August 25, 2016, also signed by defendants A. Govil, S. Govil, and Dela Rama. Therein, Defendants presented a table of Company subsidiaries, claiming 100% attributable ownership over Cemtrex India

The Company's consolidated subsidiaries and/or entities are as follows:

| Name of consolidated subsidiary or entity | State or other jurisdiction of incorporation or organization | Date of incorporation or formation (date of acquisition, if applicable) | Attributable interest |
|---|---|---|---|
| Griffin Filters, LLC | New York | September 6, 2005 (April 30, 2007) | 100% |
| ROB Cemtrex GmbH | Germany | August 15, 2013 (October 31, 2013) | 100% |
| Cemtrex Ltd | Hong Kong | September 4, 2013 | 100% |
| ROB Systems, Srl. | Romania | November 1, 2013 | 100% |
| Cemtrex India (Pvt) Ltd. | India | April 10, 2009 | 100% |

The consolidated financial statements include all accounts of the Company and its wholly-owned subsidiary as of the reporting period end dates and for the reporting periods then ended.

189.    In actuality, and as would only come to light after the publication of Unemon Article 1 (defined herein), Cemtrex has *no ownership* in Cemtrex India, as reported to the MCA. Instead, A. Govil, in his individual capacity, controls the vast majority of that entity.

190.    Defendants statements that Cemtrex beneficially owned 100% interest in Cemtrex India were thus materially false and misleading when because A. Govil, not Cemtrex, actually owned Cemtrex India and it gave the false impression that Cemtrex was a multinational company thriving in emerging markets around the world.  Further, the fact that mention of Cemtrex India

was originally included in SEC filings, then omitted, then added back for the 2015 fiscal year, and then omitted again left a material gap in investor information that the Company and Individual Defendants had a duty to correct and/or update.

> **B. Defendants Materially Misrepresent Cemtrex's Insiders' Compliance With The Federal Securities Laws And The Effectiveness Of The Company's Disclosure Controls**

191.    Throughout the Class Period, the Company operated without sufficient internal controls governing appropriate disclosures by it or corporate insiders, including the Individual Defendants.    As a result, the Company's Class Period SEC filings contain material misrepresentations about purported compliance with the federal securities laws, statements that were then proven incorrect by virtue of the belatedly filed Form 3s and 4s.

> **1. False and Misleading Statements Regarding Cemtrex Insiders' Compliance with Section 16(a)**

192.    Cemtrex's SEC filings repeat a common refrain, each of which purportedly assured Company investors that the Company's officers, directors, and greater than ten percent beneficial owners had filed all appropriate disclosures pursuant to Section 16(a):

SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

To the best of our knowledge, based solely on a review of the copies of such reports furnished to us and written representation that no other reports are required, Section 16(a) filing requirements applicable to our officers, directors, and greater than ten percent beneficial owners were filed timely during the most recent fiscal year.

193.    This statement appeared verbatim in each of the following Cemtrex SEC filings:

- The Company's Form 10-K, filed with the SEC on December 26, 2012 and signed by defendants A. Govil as Chairman of the Board, Dela Rama as CFO, and S. Govil as CEO and President, and Secretary and Director;

- The Amended Form 10-K/A filed by the Company with the SEC on January 3, 2013 and signed by defendants A. Govil as Chairman of the Board, Dela Rama as Chief Financial Officer, and S. Govil as Chief Executive Officer and President, and Secretary and Director;

- The Form 10-K filed by the Company with the SEC on January 16, 2014 and signed by defendants S. Govil as Chief Executive Officer and President, Secretary and Director of Cemtrex, and defendant Dela Rama as Chief Financial Officer;

- The Amended Form 10-K/A filed by the Company with the SEC on June 13, 2014 and signed by defendants S. Govil as Chief Executive Officer and President, Secretary and Director of Cemtrex, and defendant Dela Rama as Chief Financial Officer;

- The Amended Form 10-K/A filed by the Company with the SEC on September 26, 2014 and signed by defendants S. Govil as Chief Executive Officer and President, Secretary and Director of Cemtrex, and defendant Dela Rama as Chief Financial Officer;

194.    Beginning in late 2014, the Company omitted the Section 16(a) compliance language from its annual reports entirely and instead began asserting in its proxy statements:

**Section 16 (a) Beneficial Ownership Reporting Compliance of the Securities Exchange Act**

Section 16(a) of the Exchange Act requires the Company's executive officers, directors and persons who own more than 10% of a registered class of the Company's equity securities ("Reporting Persons") to file reports of ownership and changes in ownership on Forms 3, 4, and 5 with the SEC. These Reporting Persons are required by SEC regulation to furnish the Company with copies of all Forms 3, 4 and 5 they file with the SEC. Based solely on the Company's review of the copies of the forms it has received, the Company believes that all Reporting Persons complied on a timely basis with all filing requirements applicable to them with respect to transactions during Fiscal [year].

195.    The Company included this identical disclosure in:

- The proxy statement filed on Schedule 14A by the Company with the SEC on November 13, 2014, as submitted to shareholders by defendant Dela Rama, by order of the Board of Directors and covering fiscal year 2014;

- The proxy statement filed on Schedule 14A by the Company with the SEC on February 8, 2016, as submitted to shareholders by defendant Dela Rama, by order of the Board of Directors and covering fiscal year 2015.

196.    The Company initially acknowledged a failure by the certain of its corporate insiders to comply with Section 16(a) in its proxy statement filed on Schedule 14A with the SEC on January 30, 2017, as submitted to shareholders by defendant Dela Rama, by order of the Board of Directors, when the Company stated:

### Section 16 (a) Beneficial Ownership Reporting Compliance of the Securities Exchange Act

Section 16(a) of the Exchange Act requires the Company's executive officers, directors and persons who own more than 10% of a registered class of the Company's equity securities ("Reporting Persons") to file reports of ownership and changes in ownership on Forms 3, 4, and 5 with the SEC. These Reporting Persons are required by SEC regulation to furnish the Company with copies of all Forms 3, 4 and 5 they file with the SEC. Based solely upon a review of Forms 3, 4, and 5, furnished to the Company during the fiscal year ended September 30, 2016, and based upon certain other information provided to the Company, the Company believes that (i) Raju Panjwani, Sunny Patel and Shamik Shah, each failed to timely file a Form 3 upon their appointment as a Director of the Company and (ii) Saagar Govil failed to timely [*sic*] a Form 4 as required by Section 16(a) of the Exchange Act. Messrs Panjwani, Patel, Shah and Govil are in the process of making the appropriate filings.

197.    Despite a cursory and vague acknowledgment that certain of its directors failed to file their SEC disclosures, Cemtrex and the Individual Defendants still intentionally concealed the true extent of these individuals' (and entirely omitted defendant Dela Rama's) non-

compliance in an effort to make it appear that the Section 16(a) violations were limited to only fiscal year 2016. The need to keep the Company's common stock price stable was especially important at that juncture as the Company had just completed its rights offering and the associated warrants and preferred shares were scheduled to commence trading on the Nasdaq just weeks later. As would come to light as a result of the Pearson Article and the subsequently filed Form 4s, Cemtrex's insiders (including the Individual Defendants) had intentionally not disclosed these transaction, in violation of Section 16(a) for years prior, well beyond the limited scope disclosed by the Company.

198. Thus, the above statements were materially false and misleading when made because they failed to disclose numerous transaction entered into by the Individual Defendants throughout the Class Period (*see* Sections IV.F and VI.E, *supra*) and, thus, the Individual Defendants, as well as other Company insiders, were not in compliance with Section 16(a).

### 2. False and Misleading Statements about the Effectiveness of the Company's Disclosure Controls

199. Throughout the Class Period, the Individual Defendants caused the Company to include in its SEC filings misrepresentations about the effectiveness of the disclosure controls maintained by Cemtrex. This repeated misrepresentation stated:

> Our Chief Executive Officer and Chief Financial Officer (the "Certifying Officers") are responsible for establishing and maintaining disclosure controls and procedures for the Company. The Certifying Officers have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which this Report was prepared.
>
> Evaluation of Controls and Procedures
>
> We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Securities Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our chief executive and financial officer, to allow timely decisions regarding required disclosure. In designing and

evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, as ours are designed to do, and management necessarily was required to apply its judgment in evaluating the cost- benefit relationship of possible controls and procedures.

As of [EFFECTIVE DATE], an evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective.

Changes in Internal Controls

There have been no changes in the Company's internal controls over financial reporting that occurred during the Company's last fiscal quarter to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting, except that the Company increased its internal controls around the issuance and recording of common stock sales.

Limitations on the Effectiveness of Controls

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. The Company's disclosure controls and procedures are designed to provide reasonable assurance of achieving its objectives. The Company's chief executive officer and principal financial officer concluded that the Company's disclosure controls and procedures are effective at that reasonable assurance level.

200.   This disclosure appeared verbatim throughout the Class Period in the following

Company SEC filings:

66

| SEC Form | Filing Date | Stated Effective Date | Signatories |
|---|---|---|---|
| Form 10-K | December 26, 2012 | September 30, 2012 | Arun Govil; Renato Dela Rama, Saagar Govil, and Ravi Narayan |
| Form 10-K/A | January 3, 2013 | September 30, 2012 | Arun Govil; Renato Dela Rama, Saagar Govil, and Ravi Narayan |
| Form 10-Q | February 14, 2013 | December 31, 2012 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | May 13, 2013 | March 31, 2013 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | August 12, 2013 | June 30, 2013 | Saagar Govil; Renato Dela Rama |
| Form 10-K | January 16, 2014 | September 30, 2013 | Saagar Govil; Renato Dela Rama; Ravi Narayan |
| Form 10-Q | February 14, 2014 | December 31, 2013 | Saagar Govil; Renato Dela Rama |
| Form 10-K/A | June 13, 2014 | September 30, 2013 | Saagar Govil; Renato Dela Rama; Ravi Narayan |

201.    Beginning in April 2014, the Company shortened its disclosure control representation in its quarterly SEC filings, representing:

Disclosure controls and procedures reporting as promulgated under the Exchange Act is defined as controls and procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act are recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms. Disclosure controls and procedures include without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

Our CEO and our CFO have evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of [EFFECTIVE DATE] and have concluded that the Company's disclosure controls and procedures were effective as of [EFFECTIVE DATE].

202.    This representation appeared verbatim throughout the Class Period in the following Company SEC filings:

| SEC Form | Filing Date | Stated Effective Date | Signatories |
|---|---|---|---|
| Form 10-Q | April 30, 2014 | March 31, 2014 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | August 6, 2014 | June 30, 2014 | Saagar Govil; Renato Dela Rama |
| Form 10-Q/A | October 2, 2014 | June 30, 2014 | Saagar Govil; Renato Dela Rama |
| Form 10-Q/A | February 27, 2015 | June 30, 2014 | Saagar Govil; Renato Dela Rama |

203.    This language was slightly amended beginning in February 2015 (in **bolded underline** below), when the Company began to represent in its SEC filings that:

Disclosure controls and procedures reporting as promulgated under the Exchange Act is defined as controls and procedures that are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act are recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms. Disclosure controls and procedures include without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer ("CEO") and **Vice President of Finance ("VPF")**, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

Our CEO and our **VPF** have evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of [EFFECTIVE DATE] and have concluded that the Company's disclosure controls and procedures were effective as of [EFFECTIVE DATE].

204.    This representation appeared verbatim throughout the Class Period in the following Company SEC filings:

| SEC Form | Filing Date | Stated Effective Date | Signatories |
|---|---|---|---|
| Form 10-Q | February 13, 2015 | December 31, 2014 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | May 11, 2015 | March 31, 2015 | Saagar Govil; Renato Dela Rama |

68

| Form 10-Q/A | August 11, 2015 | June 30, 2015 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | February 16, 2016 | December 31, 2015 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | May 16, 2016 | March 31, 2016 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | August 16, 2016 | June 30, 2016 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | February 14, 2017 | December 31, 2016 | Saagar Govil; Renato Dela Rama |

205.    Shortly after amending its quarterly report representation as to the Company's disclosure controls, the Company amended the language employed in its annual reports (changes below in **bolded underline**), stating:

Our Chief Executive Officer and Chief Financial Officer (the "Certifying Officers") are responsible for establishing and maintaining disclosure controls and procedures for the Company. The Certifying Officers have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which this Report was prepared.

**Evaluation of Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Securities Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our chief executive and financial officer, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, as ours are designed to do, and management necessarily was required to apply its judgment in evaluating the cost- benefit relationship of possible controls and procedures.

**Management's Report on Internal Control Over Financial Reporting**

**The company's management is responsible for establishing and maintaining adequate "internal control over financial reporting" (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Management evaluates the effectiveness of the company's internal control over financial reporting using the criteria set forth by the Committee of Sponsoring Organizations of the**

69

**Treadway Commission (1992 framework). Management, under the supervision and with the participation of the company's Chief Executive Officer and Chief Financial Officer, assessed the effectiveness of the company's internal control over financial reporting as of September 30, 2014, and concluded that it is effective.**

**This report does not include an attestation report of the Company's Independent Registered Public Accounting Firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's Independent Registered Public Accounting Firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only Management's report in this Annual Report.**

As of September 30, 2014, an evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective.

**Changes in Internal Controls**

There have been no changes in the Company's internal controls over financial reporting that occurred during the Company's last fiscal **year** to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Limitations on the Effectiveness of Controls**

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. The Company's disclosure controls and procedures are designed to provide reasonable assurance of achieving its objectives. The Company's chief executive officer and principal financial officer concluded that the Company's disclosure controls and procedures are effective at that reasonable assurance level.

206.   This representation appeared verbatim throughout the Class Period in the following Company SEC filings:

| SEC Form | Filing Date | Stated Effective Date | Signatories |
|---|---|---|---|
| Form 10-K | December 29, 2014 | September 30, 2014 | Saagar Govil; Renato Dela Rama; Arun Govil; and Ravi Narayan |
| Form 10-K/A | January 30, 2015 | September 30, 2014 | Saagar Govil; Renato Dela Rama; Arun Govil; and Ravi Narayan |

207.    Cemtrex again amended the language employed in its annual report filings

(changes below in **bolded underline**), stating:

Our Chief Executive Officer and **Vice President of Finance** (the "Certifying Officers") are responsible for establishing and maintaining disclosure controls and procedures for the Company. The Certifying Officers have designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which this Report was prepared.

**Evaluation of Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our Securities Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our chief executive and financial officer, to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, as ours are designed to do, and management necessarily was required to apply its judgment in evaluating the cost- benefit relationship of possible controls and procedures.

**Management's Report on Internal Control Over Financial Reporting**

The company's management is responsible for establishing and maintaining adequate "internal control over financial reporting" (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Management evaluates the effectiveness of the company's internal control over financial reporting using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework). Management, under the supervision and with the participation of the company's Chief Executive Officer and **Vice President of**

71

**Finance**, assessed the effectiveness of the company's internal control over financial reporting as of [EFFECTIVE DATE], and concluded that it is effective.

This report does not include an attestation report of the Company's Independent Registered Public Accounting Firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's Independent Registered Public Accounting Firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only Management's report in this Annual Report.

As of [EFFECTIVE DATE], an evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective.

**Changes in Internal Controls**

There have been no changes in the Company's internal controls over financial reporting that occurred during the Company's last fiscal year to which this report relates that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Limitations on the Effectiveness of Controls**

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. The Company's disclosure controls and procedures are designed to provide reasonable assurance of achieving its objectives. The Company's chief executive officer and principal financial officer concluded that the Company's disclosure controls and procedures are effective at that reasonable assurance level.

208.   This representation appeared verbatim throughout the Class Period in the following Company SEC filings:

| SEC Form | Filing Date | Stated Effective Date | Signatories |
|---|---|---|---|
| Form 10-K | December 21, 2015 | September 30, 2015 | Saagar Govil; Renato Dela Rama; Arun Govil; Raju Panjwani; Sunny Patel; and Shamik Shah |
| Form 10-K/A | August 25, 2016 | September 30, 2015 | Saagar Govil; Renato Dela Rama; Arun Govil; Raju Panjwani; Sunny Patel; and Shamik Shah |
| Form 10-K | December 28, 2016 | September 30, 2016 | Saagar Govil; Renato Dela Rama; Arun Govil; Raju Panjwani; Sunny Patel; and Shamik Shah |

209.    Further, throughout the Class Period defendants Saagar Govil and Renato Dela

Rama regularly filed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002,

stating:

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which

73

this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonable likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

210.   These certifications by each defendant S. Govil and Dela Rama were filed as exhibits to the following Cemtrex SEC filings during the Class Period:

| SEC Form | Filing Date | Period Covered by Certification |
|---|---|---|
| Form 10-K | December 26, 2012 | Fiscal year ended September 30, 2012 |
| Form 10-K/A | January 3, 2013 | Fiscal year ended September 30, 2012 |
| Form 10-K | January 16, 2014 | Fiscal year ended September 30, 2013 |
| Form 10-K/A | July 13, 2014 | Fiscal year ended September 30, 2013 |
| Form 10-K/A | September 26, 2014 | Fiscal year ended September 30, 2013 |
| Form 10-K | December 29, 2014 | Fiscal year ended September 30, 2014 |
| Form 10-K/A | January 30, 2015 | Fiscal year ended September 30, 2014 |
| Form 10-K | December 21, 2015 | Fiscal year ended September 30, 2015 |

| Form 10-K/A | August 25, 2016 | Fiscal year ended September 30, 2015 |
|---|---|---|
| Form 10-K | December 28, 2016 | Fiscal year ended September 30, 2016 |
| Form 10-Q | February 14, 2013 | Fiscal quarter ended December 31, 2012 |
| Form 10-Q | May 13, 2013 | Fiscal quarter ended March 31, 2013 |
| Form 10-Q | August 12, 2013 | Fiscal quarter ended June 30, 2013 |
| Form 10-Q | February 14, 2014 | Fiscal quarter ended December 31, 2013 |
| Form 10-Q | April 30, 2014 | Fiscal quarter ended March 31, 2014 |
| Form 10-Q | August 6, 2014 | Fiscal quarter ended June 30, 2014 |
| Form 10-Q/A | October 2, 2014 | Fiscal quarter ended June 30, 2014 |
| Form 10-Q | February 13, 2015 | Fiscal quarter ended December 31, 2014 |
| Form 10-Q/A | February 27, 2015 | Fiscal quarter ended June 30, 2014 |
| Form 10-Q | May 11, 2015 | Fiscal quarter ended March 31, 2015 |
| Form 10-Q | August 11, 2015 | Fiscal quarter ended June 30, 2015 |
| Form 10-Q | February 16, 2016 | Fiscal quarter ended December 31, 2015 |
| Form 10-Q | May 16, 2016 | Fiscal quarter ended March 31, 2016 |
| Form 10-Q | August 15, 2016 | Fiscal quarter ended June 30, 2016 |
| Form 10-Q | February 14, 2017 | Fiscal quarter ended December 31, 2016 |

211.   Yet, as alleged herein, these statements were materially false and misrepresentative because the Company did not maintain effective disclosure controls, as evidenced by its failure to monitor the securities transactions of its corporate insiders who were otherwise required to file certain SEC reports pursuant to Section 16(a), the consolidation of Cemtrex India, which should not have been reported as part of Cemtrex's financial results and misleading disclosures regarding Periscope's automotive business.

212.   The Company's failure to maintain adequate internal controls is exacerbated by its claim in certain SEC filings that "[t]here have been no changes in the Company's internal controls . . . that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting, *except that the Company increased its internal controls around the issuance and recording of common stock sales*," evidencing

knowledge of the Individual Defendants of the importance of maintaining adequate controls in these areas:

| SEC Form | Filing Date | Stated Effective Date | Signatories |
|---|---|---|---|
| Form 10-K | December 26, 2012 | September 30, 2012 | Arun Govil; Renato Dela Rama, Saagar Govil, and Ravi Narayan |
| Form 10-K/A | January 3, 2013 | September 30, 2012 | Arun Govil; Renato Dela Rama, Saagar Govil, and Ravi Narayan |
| Form 10-Q | February 14, 2013 | December 31, 2012 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | May 13, 2013 | March 31, 2013 | Saagar Govil; Renato Dela Rama |
| Form 10-Q | August 12, 2013 | June 30, 2013 | Saagar Govil; Renato Dela Rama |
| Form 10-K | January 16, 2014 | September 30, 2013 | Saagar Govil; Renato Dela Rama; Ravi Narayan |
| Form 10-Q | February 14, 2014 | December 31, 2013 | Saagar Govil; Renato Dela Rama |
| Form 10-K/A | June 13, 2014 | September 30, 2013 | Saagar Govil; Renato Dela Rama; Ravi Narayan |

### 3. False and Misleading Statements About the Company's Insider Holdings

213.    As set forth herein, throughout the Class Period, Company insiders were engaging in a variety of transactions involving Cemtrex securities that were not being timely reported to Lead Plaintiffs and the investing public, if they were reported at all.

214.    For its part, the Company continued to file materially misrepresentative SEC filings including insider ownership interest that contorted or outright lied about the equity holdings of these individuals – misrepresentations that were first exposed in the Pearson Article and then confirmed by the March 2017 Form 4s.

215.   For example, the December 26, 2012 Form 10-K; January 3, 2013 Form 10-K/A; January 16, 2014 Form 10-K; June 13, 2014 Form 10-K/A; September 26, 2014 Form 10-K/A; and November 13, 2014 Proxy Statement on Schedule 14A all represent defendant Dela Rama's equity holdings in the Company as 400,000 shares of common stock.  Defendant Dela Rama's holdings are then represented as 66,667 shares of common stock in the Proxy Statement filed on Schedule 14 on February 28, 2016 – one-sixth of the previously reported amount attributable to the April 2015 reverse stock split.  Finally, on January 30, 2017, Dela Rama's holdings were purportedly 46,834 shares – a representation from which an investor would infer Dela Rama sold the nearly 20,000 in the interim period between the two proxies.  However, as would only be revealed upon the March 3, 2017 filing of a Form 4, Dela Rama had actually engaged in eleven separate transactions in Company common stock even prior to the February 28, 2016 Proxy, the vast majority of which included the disposal of shares either through a sale or gift. The result was a blatant overstatement of Dela Rama's holdings and the concealment from the public that one of the Company's longstanding insiders was actually reducing his total position in the Company by more than 20%.

216.   These statements regarding Dela Rama's holdings were materially false and misleading when made because they overstated his holdings and underreported his insider transactions.

### C. Defendant S. Govil and the Company Materially Misrepresent the Prospects of the Company's EMS Segment and its Automotive Division

217.   Despite the Company's and S. Govil's self-promotion and use of industry-wide metrics in an effort to convince the investing public of the Company's future prospects, S. Govil and the rest of Company management were aware that Cemtrex's German EMS segment,

particularly its automotive business, were struggling with difficult economic conditions, even with the Periscope acquisition.

218.    ROB Cemtrex General Manager Frank Bittighofer would admit as much, stating that the Company was forced to change it outlook for the Paderborn facility *month-after-month* as new orders continued to decline and existing customers dried up.

219.    Thus, Defendants' September 8, 2016 statement that the Company's newly-added automotive subsidiary was "expected to generate an estimated roughly $33 million over the next 12 months" was materially false and misleading when made because Defendants had no reasonable expectation of achieving anywhere close to $33 million in revenue from the automotive segment, particularly as Bittighofer indicated that there were months of insight into the Paderborn issues and the Company's revenues for its *entire EMS Segment for 2015 totaled just $19 million*.

220.    The Company's December 13, 2016 press release is equally egregious with respect to the false and misrepresentative statements made therein.  Defendant S. Govil states, "We are extremely optimistic about the opportunities in front of us and our ability to leverage them with our growing organization."  This, statement was materially false and misrepresentative as there was no reasonable basis for such optimism, particularly as to the Company's automotive business, with falling sales and orders, would soon necessitate a plant closure.

## VI.    THE TRUTH IS REVEALED OVER A SERIES OF PARTIAL DISCLOSURES WHILE THE COMPANY DOUBLES DOWN ON ITS MISINFORMATION AND CONTINUES MAKING FALSE STATEMENTS

### A.    Two Independent Investors/Financial Authors Bring Defendants' Misrepresentations To Light

221.    On February 22, 2017, two different financial authors published fully-researched exposés about Cemtrex on the financial website SeekingAlpha.com, revealing the Company's misrepresentations and corporate malfeasance.

222.    First, financial analyst and author Richard Pearson published on Seeking Alpha and his own website at approximately 9:45 a.m. an article titled "Cemtrex: Documents and Photos, All Signs Point to Deception and Failure" (the "Pearson Article").

223.    The Pearson Article revealed that: (1) Cemtrex was being heavily promoted by a known stock promotion firm who had previously been connected with companies that have had their securities halted or delisted by the SEC; (2) Arun Govil had paid for at least one of these stock promotion articles through an entity he controlled, Southern Steel; (3) Cemtrex insiders failed to disclose any sales in Company common stock, as required by Section 16(a); (4) Cemtrex's auditor, PBA, was claiming a Texas address that was actually the site of an abandoned strip mall, and the audit firm itself was closely associated with an individual who had previously been the subject of an SEC cease-and-desist order for issuing unqualified audit reports by virtue of his lack of PCAOB registration and appropriate licensing; and (5) the Company had engaged several investment banks and investor relations firms who have repeatedly represented other heavily promoted companies and who have otherwise been implicated in securities fraud.

224.    Also on February 22, 2017, a second author who goes by the moniker "Unemon1" published two separate posts to his Seeking Alpha blog.  The first, titled "Is India the new China

for Stock Scams? Cemtrex Inc. Warrants a SEC Investigation and Delisting, CETX Lied About Ownershp [*sic*] in its Filings," ("Unemon Article 1"), and published at 10:23 am, focused on discrepancies in the Company's SEC filings with respect to Cemtrex's ownership over its purportedly wholly-owned subsidiary Cemtrex India and documents that entity actually filed with the Indian regulator showing its primary stockholder as A. Govil in his individual capacity and making no mention of Cemtrex as a parent. The second, published at 10:52 am and titled "CETX is an Over-Leveraged Companies [*sic*] that Acquired Poorly Performing Businesses by Ramping up Debt. The ROB Cemtrex GmbH Case," ("Unemon Article 2") focused on the Company's use of related-party debt to finance its various acquisitions and perceived incongruities with the financial statements filed by the ROB Group and then ROB Cemtrex GmbH with the German regulators, as compared to representations made by the Company with the SEC.

225.     Collectively, the Pearson Article, Unemon Article 1, Unemon Article 2, and Unemon Article 3 (defined herein) are referred to herein as the "Disclosure Articles."

226.     The revelations contained in the Disclosure Articles published to that point sent the Company's stock careening downwards from a closing price of $5.12 on February 21, 2017 (on volume of 972,000 shares), to a closing price of $3.40 on February 22, 2017 on volume of more than 8.2 million shares – representing a loss of nearly 30%.

**B. The Company Enters Damage Control Mode And Continues To Spread Misinformation About Its SEC Reporting While Omitting Any Reference To Its Plan To Close One Of Its German Plants**

227.     In the immediate aftermath of the first three Disclosure Articles' publications, the Company went on the offensive seeking to control the negative spin. On February 22, 2017 (the same day the first three Disclosure Articles were published), Cemtrex issued a press release – "a

response on behalf of its shareholders in relation to a malicious blog post containing false and misleading information published by short sellers on the Seeking Alpha website."

228.    However, therein the Company continued to perpetuate misinformation, falsely stating:

> As is easily confirmed by a review of Cemtrex's proxy filings with the SEC, Arun Govil and Saagar Govil have not sold shares of Cemtrex in several years. In addition, CEO Saagar Govil and Cemtrex Founder Arun Govil are committed to purchasing additional shares of Cemtrex in the open market and will file the appropriate Form 4's with the SEC accordingly in the days to come.

229.    This statement was false and misleading when made as it was not true that A. Govil had not sold shares in several years. In fact, Ducon, which is wholly-owned by A. Govil, sold hundreds of thousands of shares just months prior after A. Govil paid almost $100,000 to a stock promotion firm in order to inflate Cemtrex's stock price.

230.    Defendants then contradicted themselves while proffering additional false statements on the February 23, 2017 conference call with investors. A transcript of this call was filed by the Company with the SEC as an exhibit to a Form 8-K filed on March 1, 2017 and signed by Saagar Govil as Chairman, President, and Chief Executive Officer of Cemtrex.

231.    On this conference call, Saagar Govil stated:

> You can see from the proxy statements of the company that no shares were sold by Arun or me, except for the shares sold by Ducon, an entity controlled by Arun in which he filed a Form 144, and it was disclosed and sold shares for Ducon in the ordinary course of business. Ducon also bought over 300,000 units of preferred shares on the same terms as all other investors in the recent rights offering.

232.    Aside from contradicting the Company's statement from the prior day and admitting to A. Govil's sale of hundreds of thousands of shares of Cemtrex common stock which would have occurred just months prior, as purportedly evidenced by a Form 144 (which does not show actual sales, but rather only an intent to sell), Saagar Govil also falsely represented that

Ducon had purchased over 300,000 units of preferred shares on the same terms as all other investors in the recently completed rights offering.  In actuality, Ducon came to own these preferred shares by way of the extremely generous conversion of the $3.4 million note he provided to finance the Periscope acquisition, discussed further *infra*, Section VIII.D.

233.    This statement by S. Govil was materially false and misleading when made as it sought to manipulate the limited information in the market to give the appearance that A. Govil and Ducon were buying into the Company on the same terms as any outside investor.  Instead, A. Govil and Ducon were being handed dilutive Company securities on beneficial terms, but only after siphoning off cash interest payments from Cemtrex's accounts.

234.    On the same call, defendant S. Govil also materially misrepresented the status of the Company's German EMS segment, as related to the automotive business and the outlook of ROB Cemtrex as a whole in the wake of the Periscope acquisition:

> Cemtrex's electronics manufacturing services division has experienced dramatic growth this past year. Cemtrex's products are used in a variety of industries, including wearable devices, automobiles, telecommunications, industrial products, appliances, home automation, industrial automation, and medical devices. Many of our customers are an industry that are expanding rapidly [sic], and we expect to benefit from that growth. Cemtrex is focused on building relationships with market leaders and customers with high-growth potential in growing markets such as automotive electronics, medical devices, and wearables.

> In 2016, in our EMS division, we produced more than 300 different products for more than 50 customers, such as Harman International, AVB, and Schneider Electric. We have strengthened and grown our market share in Germany through the acquisition of Periscope. Periscope, now operating under our ROB Cemtrex brand, is focused on EMS for major automotive producers, primarily Tier 1 suppliers as well as for, uh, telecommunications, industrial goods, luxury consumer products, display technology, and other OEMs.

> Periscope has more than 35 years of operating experience under prior owners, like Siemens and Flextronics. The Periscope acquisition also gives Cemtrex a strong footing in the dynamic automobile industry, which is undergoing rapid technology change, with Cemtrex poised to be a significant beneficiary of this

evolution and disruption. The automotive electronics market is expected to be 350 billion by 2023, up from 185 billion in 2015, according to Global Market Insights.

Our opportunities in this space reflect anticipated growth globally. New Venture Research predicts the EMS industry at 621 billion in 2019, up from 460 billion in 2014, as more companies rely on outsourcing electronics manufacturing. ECS Insights projects the wearable device market to reach 34 billion by 2020. IDTechEx forecasts it will reach 75 billion by 2025. Research in markets estimates that the industrial control and factory automation market will reach 20—uh, 200 billion by 2020, which represents an annual growth rate of 6 percent.

235.    S. Govil's presentation of the EMS segment, particularly the Periscope acquisition and the "strong footing in the dynamic automobile industry" was materially false and misleading when made because it entirely omitted the then-known issues with the segment and difficulties with existing and new orders – consistent economic problems that would ultimately cause announcement **just one week later** of the closing of a facility purchased months prior.

### C. ROB Cemtrex Informs Its Employees And The German Works Council Of Its Intention To Close Its Recently Acquired Paderborn, Germany Facility

236.    On Tuesday, February 28, 2017, ROB Cemtrex managing director Frank Bittighofer informed the German works council and affected employees of the Company's intention to shut down the Paderborn facility housing ROB Cemtrex Automotive GmbH, acquired just months earlier in the acquisition of Periscope.

237.    Despite not being reported by American financial news media, the announcement negatively impacted the Company's stock price, sending Cemtrex's stock to a closing price of $3.54 on February 28, 2017, down more than 7% over the prior day's close of $3.82.

238.    On March 1, 2017, ROB Cemtrex sent a letter to its customers informing them of the decision to shut down the Paderborn plant.  Therein, Frank Bittighofer stated:

The background to this decision is basically reduced sales numbers and in particular the absence of new order business, which we were expecting to get for our plant in Paderborn.  The permanent operation of our plant has become, under consideration of the achieved occupancy rate, economically impossible.

83

Our decision to close down our plant in Paderborn, after processing all existing orders, is therefore unavoidable.  We would like to point out, that this decision was not easy to take for us.  But we wanted to take it at a time, where we still see a chance to shape our business relation in accordance to our mutual interests.

239.    As would later be disclosed, the decision to close the facility was the result of

month-after-month shortfalls in new orders, all despite S. Govil's concurrent representations that

Cemtrex was positioned to financially benefit from the evolving EMS industry, especially in the

automotive space.

### D.   German Language Media Begins To Report Cemtrex's Plans To Shutter The Paderborn, Germany Facility

240.    On March 2, 2017, German newspaper *Neue Westfälische* published an article at

9:20 pm local time (3:20 pm ET) reporting on Cemtrex's plan to close its Paderborn facility and

lay off its 120 employees.

241.    Therein, the article quoted ROB Cemtrex managing director Frank Bittighofer,

who confirmed that the Company had informed the works council and employees earlier that

week, while also lamenting the economic climate that required the shutdown.   Roughly

translated, the article states:

The background to the decision was a sharp decline in sales and, above all, a lack of new orders. "We had to take back the plans month after month. Now a level has been reached that makes a permanent operation economically impossible," said Bittighofer.

In Paderborn, electronic parts are mainly produced for suppliers to the automotive industry and telecommunications companies. Particularly affected by the announcement of one of the key customers to suffer even a massive slump in demand for telephone equipment and accessories. Managing Director Bittighofer: "The ongoing technology change in this sector does not allow any significant new orders to be expected. Adding to that is a heavy price pressure. "

In the medium term, this can not be offset by other production orders. In addition, there would be political risks for the overall economy; Therefore, other customers are cautious about new projects. Against this background, ultimately, the decision to close the Paderborn plant after processing the existing orders is inevitable. Bittighofer: "This step is not easy for us. However, we also wanted to

84

do this in the interests of the employees at a time when there are still design options available. The better the numbers develop over the next few months, the more scope we have for this. "The details are to be defined together with the works council.[5]

242.     On this news, the Company's stock price would drop nearly 10%, from a closing price of $4.05 on March 1, 2017 to $3.66 on March 2, 2017.

**E.    Company Insiders Seek To Correct Their Past Securities Law Violations By Belatedly Filing Form 4s That Evidence A Pattern Of Sales And Further Corroborate The Disclosure Articles**

243.     Despite a vehement denial of any of the claims set forth in the Pearson Article, by early March 2017, Company insiders could no longer run from the fact that each had violated Section 16(a) by failing to timely file their Form 3s and Form 4s.

244.     On March 3, 2017, defendant Dela Rama filed a Form 4 disclosing thirteen separate transactions occurring between March 2015 and July 2016, all but one of which involved the disposal of Company stock.

245.     On March 6, 2017, Saagar Govil filed a Form 4 disclosing eight separate transactions in Company stock, all taking place between February 2013 and February 2017.

246.     On March 6, 2017, the Company's common stock closed at $3.35 per share, a nearly 9% decline over the closing price on March 3, 2017.

247.     On March 7, 2017, Shamik Shah filed both his initial statement of beneficial ownership on Form 3 and a Form 4 evidencing the acquisition of Series 1 Preferred Stock of Cemtrex.

248.     On March 7, 2017, Sunny Patel filed his initial statement of beneficial ownership on Form 3.

---

[5]     The German language article is available at http://www.nw.de/lokal/kreis_paderborn/paderborn/21708958_US-Konzern-entlaesst-alle-120-Mitarbeiter-in-Paderborn.html.

**F. Unemon1 Publishes A New Article Amplifying News Of Cemtrex's Planned Closure Of Its Paderborn, Germany Facility**

249.    On March 6, 2017, Unemon1 published a new article on his Seeking Alpha blog at 10:16 am, linking to his own website and reporting on the March 2, 2017 *Neue Westfälische* article discussing the Paderborn facility's closure ("Unemon Article 3").  Therein, Unemon1 discussed the Paderborn plant's closure in the context of Cemtrex's Periscope acquisition and highlighted Company management's past optimistic statements about the Periscope acquisition and failure to publicly disclose the news which, to that point, had only been reported by the German media.

250.    On March 6, 2017, the Company's common stock closed at $3.35 per share, a nearly 9% decline over the closing price on March 3, 2017.

**VII.    POST-CLASS PERIOD EVENTS**

251.    In the wake of the Disclosure Articles and Defendants' denials which were then subsequently contradicted by corporate filings, Cemtrex's common stock has continued to drop while the Defendants seek to control the decline.

252.    On March 6, 2017, the Company announced that it had filed a lawsuit against the author of the Pearson Article in this Court, seeking punitive damages, money damages and interest.  That action, captioned at *Cemtrex, Inc. v. Ricardo Antonio Pearson a/k/a Richard Pearson et al.*, Case No. 2:17-cv-01258-JS-AKT, was subsequently voluntarily dismissed by the Company, as ordered by the court on June 12, 2017.

253.    On March 13, 2017, the Company announced that it had purchased more than 130,000 shares, which, when coupled with the more than 201,000 share buyback announced on March 1, 2017, brought  the total number of repurchased shares to approximately 332,000, or more than 3% of all shares of common stock then issued and outstanding.

254.     On September 5, 2017, the Company announced an exchange offer to acquire Key

Tronic Corporation ("KTCC") by offering to exchange each outstanding share of common stock

of KTCC for one share of Cemtrex common stock.  Cemtrex also filed a Form S-4 Registration

Statement with the SEC on the same day setting forth the basis for its purported exchange offer.

255.     KTCC responded with a press release of its own on September 6, 2017, stating

that prior to the public filing of the S-4 by Cemtrex, "Key Tronic was unaware of [Cemtrex's]

purported interest in Key Tronic and had not had any communications with [Cemtrex] or any of

its affiliates relating to such interest."

256.     KTCC further set forth the seeming disconnect between the Cemtrex offer and the

two companies' stock prices:

> At the close of business on September 6, 2017, the closing price for Key Tronic's
> common stock was $6.81 and the closing price for Filer's common stock was
> $3.15.  Consequently, the purported offer would represent a discount of 53.7% per
> share to the price of Key Tronic's common stock as of the closing prices of
> September 6, 2017.

257.     Unmoved by the obvious value discrepancy between the companies' market caps,

Cemtrex issued a new press release on September 13, 2017, claiming that "on a fundamental

valuation basis, Cemtrex's offer is of significant value that is not readily apparent when simply

looking at each company's stock price alone."

258.     KTCC again responded through a press release on September 15, 2017, this time

confirming the Articles and deeming certain issues with the Cemtrex offer insurmountable:

> If this offer were in fact made, the purported offer would give Key Tronic
> shareholders only one Cemtrex share (which had a closing price of $3.19 as of
> September 14, 2017) for one Key Tronic share (which had a closing price of
> $6.85 as of September 14, 2017).  Key Tronic believes that there is no reason to
> assume that the public prices are not a significant market indicator of the relative
> values of the shares of the two companies.  The exchange would have resulted in

an immediate discount of approximately 53% per share to the price of Key Tronic's common stock based on the closing prices on September 14, 2017.

• The financial comparisons that Issuer makes to Key Tronic are very misleading because, among other things, Issuer does not properly identify the periods it is comparing, appropriately consider the size and maturities of Key Tronic and the Issuer, or explain how ratios and percentages are calculated.

• ***Financial comparisons depend on reliable underlying auditor-reviewed financial information. Key Tronic is very skeptical of the accuracy of Issuer's reported financial information due in part to the fact that:***

• ***Issuer is not audited by a nationally recognized accounting firm.***

• ***One published media report has raised questions about Issuer's auditor, Bharat Parikh & Associates, headquartered in India. According to public records of the Public Company Accounting Oversight Board, Bharat Parikh & Associates audited a total of five public companies during the twelve months ending in March 2017, all of which were small public companies.***

• ***The Issuer has not addressed how it would be able to pay off Key Tronic debt or address covenants contained in Key Tronic's loan agreements if Issuer were to consolidate or merge with Key Tronic.***

• ***Key Tronic has never encountered Issuer in the electronic manufacturing services (EMS) market space, nor was Key Tronic aware of Issuer's existence before Issuer filed a registration statement regarding this purported offer.***

• Our initial research shows Issuer reports approximately $45 million of EMS revenue. In our opinion, this does not qualify Issuer to make any statements as to how it might operate an EMS business like Key Tronic which is over 10 times Issuer's current size in terms of revenue.

As we stated in a prior press release, Key Tronic was unaware of any purported interest in Key Tronic by Issuer and had not had any communication with Issuer or any of its affiliates relating to such interests prior to becoming aware of the Issuer's filings on September 5, 2017. ***Key Tronic has extremely serious concerns about the accuracy of Issuer's statements and its motives, as well as the legitimacy of the purported offer.***

259. After a September 26, 2017 press release where Cemtrex "ask[ed] shareholders to consider the facts," on October 23, 2017, Cemtrex revised its exchange offer, offering to acquire every share of KTCC common stock for one series 2 Cemtrex unit consisting of (i) one $10 4%

88

debenture due 2024 and (ii) one third (1/3rd) share of Cemtrex common stock.  The revised offer purportedly represented a value of $11.00 per KTCC share.

260.    On October 26, 2017, KTCC responded, issuing a press release that reiterated that the company has not had any communications from Cemtrex detailing its purported offer and reaffirming that "[d]espite [Cemtrex's] statements that this is an increase in value over its earlier purported offer, Key Tronic continues to have extremely serious concerns about the accuracy of Issuer's statements provided in Issuer's public disclosures regarding the purported offer and its motives, as well as the legitimacy of the purported offer."

261.    On April 18, 2018, Cemtrex filed with the SEC a request for withdrawal of the Form S-4 registering the securities that were to be used to effect the KTCC takeover, signifying an end to its latest effort to use its stock as currency to acquire another company.

262.    On February 20, 2018, Cemtrex filed with the SEC a definitive proxy statement on Schedule 14A seeking stockholder ratification of the selection of BPA as the Company's independent registered public accounting firm, a recommendation the Cemtrex Board unanimously made in the proxy.  Therein, the Company stated:

> The Board of Directors has selected Bharat Parikh & Associates to serve as the Company's independent registered public accounting firm for the fiscal year ending September 30, 2018. Bharat Parikh will audit the Company's consolidated financial statements for the 2018 fiscal year and perform other services. While shareholder ratification is not required by the Company's By-laws or otherwise, the Board of Directors is submitting the selection of Bharat Parikh & Associates to the shareholders for ratification as part of good corporate governance practices. If the shareholders fail to ratify the selection, the Board of Directors may, but is not required to, reconsider whether to retain Bharat Parikh & Associates. Even if the selection is ratified, the Board of Directors in its discretion may direct the appointment of a different accounting firm as the independent registered public accounting firm for the Company for the year ending September 30, 2018 at any time during the year if it determines that such a change would be in the best interest of the Company and its shareholders.

263.    Further, this proxy set forth the duties of the Company's standing audit committee, as well as that committee's reports:

**Audit Committee**

The Audit Committee, which has been established in accordance with requirements of Section 3(a)(58)(A) of the Exchange Act, is comprised of the following independent directors: Sunny Patel (Chair), Raju Panjwani and Metodi Filipov. The Board of Directors has determined that each member of the Audit Committee: (i) is independent, (ii) meets the financial literacy requirements of the Nasdaq Rules, and (iii) meets the enhanced independence standards established by the SEC. In addition, the Board has determined that Mr. Patel qualifies as an "audit committee financial expert" as that term is defined in Item 407(d)(5)(ii) of Regulation S-K promulgated under the Exchange Act by the SEC.

The Audit Committee is primarily concerned with the integrity of our financial statements, the independence, qualifications and performance of our independent registered public accounting firm, and our compliance with legal requirements. The Audit Committee operates under a written charter approved by the Board of Directors and the Audit Committee that reflects standards and requirements adopted by the SEC and NASDAQ.

As indicated in its charter, the Audit Committee's duties include selecting and engaging our independent registered public accounting firm; reviewing the scope of the audit to be conducted by our independent registered public accounting firm; overseeing our independent registered public accounting firm and reviewing the results of its audit; reviewing our financial reporting processes, including the accounting principles and practices followed and the financial information provided to shareholders and others; overseeing our internal control over financial reporting and disclosure controls and procedures; and serving as our legal compliance committee.

\* \* \*

Management is responsible for our system of internal controls over financial reporting and for preparing our financial statements. Our independent registered public accounting firm, Bharat Parikh, is responsible for performing an independent audit of our consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB") and to issue a report thereon. The Audit Committee is responsible for overseeing management's conduct of the financial reporting process and system of internal control.

During the fiscal year ended September 30, 2017, the Audit Committee met regularly and held discussions with management and the independent

registered public accounting firm. During these meetings and in meetings concerning our Annual Report for the year ended September 30, 2017, the Audit Committee has:

- reviewed and discussed the audited financial statements included in our Annual Report for the year ended September 30, 2017 with management and our independent registered public accounting firm;

- received the written disclosures and communications from the independent registered public accounting firm that are required by the applicable requirements of the PCAOB regarding such firm's communications with the Audit Committee concerning independence and has discussed with such firm its independence; and

- discussed with the independent registered public accounting firm the matters required to be discussed under Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380), as adopted by the PCAOB in Rule 3200T, or any successor rule.

Based on the reviews and discussions referred to above, the Audit Committee recommended to the Board of Directors that the audited financial statements of the Company and its subsidiaries be included in the Annual Report for the year ended September 30, 2017 for filing with the SEC.

The Audit Committee has relied, without independent verification, on management's representation that the financial statements have been prepared with integrity and objectivity and in conformity with accounting principles generally accepted in the United States and on the representations of the independent registered public accounting firm included in its report on our financial statements. The Audit Committee's considerations and discussions with management and the independent registered public accounting firm do not, however, ensure that our financial statements are presented in accordance with generally accepted accounting principles or that the audit of our financial statements has been carried out in accordance with the standards of the PCAOB.

The information contained in this report shall not be deemed to be "soliciting material" or "filed" or incorporated by reference in future filings with the SEC, or subject to the liabilities of Section 18 of the Securities Exchange Act of 1934, except to the extent that the Company specifically incorporates it by

reference into a document filed under the Securities Act of 1933, as amended, or the Exchange Act.

MEMBERS OF THE AUDIT COMMITTEE

Sunny Patel, Chair
Raju Panjwani
Shamik Shah

264.     Despite the audit committee and Board's seemingly resolute support of BPA as Cemtrex's auditor, on February 27, 2018 – *just one week after the filing of the Proxy recommending stockholder approval of BPA* – the Company filed a Form 8-K with the SEC indicating that the audit committee dismissed BPA the prior day:

On February 27, 2018, The Audit Committee (the "Audit Committee") of the Board of Directors of Cemtrex, Inc., (The "Company") determined not to continue with the Registrant's then accountants and to engage a different accounting firm. On February 26, 2018, the Company dismissed Bharat Parikh & Associates, located in Vadodara, India as its independent registered public accounting firm.

During the fiscal years ended September 30, 2016, and 2017, and the subsequent interim periods through February 27, 2018, there were (i) no disagreements (as described in Item 304(a)(1)(iv) of Regulation S-K and the related instructions) between the Company and Bharat Parikh & Associates on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which, if not resolved to Bharat Parikh & Associates' satisfaction, would have caused Bharat Parikh & Associates to make reference thereto in their reports on the financial statements for such years, and (ii) no "reportable events" within the meaning of Item 304(a)(1)(v) of Regulation SK.

The Registrant has provided Bharat Parikh & Associates with a copy of this disclosure and has requested that they furnish a letter addressed to the U.S. Securities and Exchange Commission stating whether it agrees with the above statements, and if not, stating the respects in which it does not agree. A copy of the letter from Bharat Parikh & Associates addressed to the U.S. Securities and Exchange Commission is filed as an Exhibit to this Current Report on Form 8-K.

On February 27, 2018, (the "Engagement Date"), the Company engaged Green & Company, CPAs ("Green & Company") as its independent registered public accounting firm after the Audit Committee formally approved the decision

to engage Green & Company as the Company's independent registered public accounting firm.

265.    On March 23, 2018, the Company announced the purchase of a 46% stake in Vicon Industries, Inc. ("Vicon"), a producer of video management systems for use in security, surveillance, safety and communication applications.  Following the close of the Vicon transaction, Saagar Govil and Arun Govil joined the Vicon Board of Directors and Saagar Govil assumed the position of Chief Executive Officer of Vicon.

266.    Unsurprisingly, Cemtrex effected this acquisition by leveraging its common stock as currency, exchanging 1,012,625 shares of Cemtrex common stock for the 7,284,824 shares of Vicon common stock and a warrant to purchase an additional 1,500,000 shares of common stock that comprised the 46% equity position.

267.    The Vicon holdings were purchased from former Vicon shareholder NIL Funding Corporation ("NIL").  Now controlling nearly 8.8% of Cemtrex's common stock, NIL is now seeking to sell all of its holdings, with Cemtrex filing a Form S-3 registration statement with the SEC on April 20, 2018 to register the shares paid to NIL in the transaction.

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

268.    As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

269.   The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Cemtrex and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings.  As a result, each could falsify the information that reached the public about the Company's business and performance.

270.   Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's disclosure control deficiency and the failures of corporate insiders to comply with the federal securities laws.  Such actions allowed Cemtrex to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Cemtrex as the Individual Defendants were among Cemtrex's most senior management and were acting within the scope of their employment.

**A.  The Individual Defendants' Knowledge and/or Recklessness**

**1.  The Individual Defendants' Actual Knowledge of Their Own Undisclosed Insider Transactions in Company Stock**

271.   The Individual Defendants engaged in numerous, material undisclosed insider transactions prior to and throughout the Class Period that they did not report on Forms 3, 4 or 5, or in any Company SEC filings until after the Class Period.  It goes without saying that the Individual Defendants have knowledge of their own insider stock transactions.  Moreover, the Individual Defendants, being sophisticated, executive officers of the Company, were certainly aware of their obligation to timely file Forms 3, 4 and 5 with the SEC.  Thus, they were aware that their Class Period statements that Cemtrex was in compliance with applicable SEC regulations and the amount of their holdings were false and misleading when made. As the

Individual Defendants eventually admitted, they failed to timely report their insider transactions, as described above.  *See* Sections IV.F and VI.E, *supra*.

### 2. A. Govil's Actual Knowledge of Material Misstatements Regarding Cemtrex India is Presumed Where He Maintained Majority Ownership of that Entity

272.    Throughout the Class Period, A. Govil owned approximately 86% of Cemtrex India. Cemtrex did not, and never has, owned any part of Cemtrex India.  Yet, to create the perception of a thriving international company, Cemtrex sporadically reported that Cemtrex India was owned by Cemtrex and even consolidated it into the Company's financial statements, rendering Defendants' statements that Cemtrex India was part of the Company's business operations and consolidated financial statements false and misleading when made.   At a minimum, A. Govil is presumed to have knowledge of his false statements as *he* owned the majority of Cemtrex India and also signed off on the Company's public filings with the SEC.

### 3. The Individual Defendants' Actual Knowledge that their Statements About the Automotive Segment of Periscope Were False and Misleading When Made

273.    While, in September 2016, the Individual Defendants touted the future of ROB Cemtrex Automotive GmbH as adding an additional $33 million in revenue over the next twelve months, at the same time, they were admittedly aware, *for months* prior, that a technology change and "heavy price pressure[s]" in the sector foreclosed any new orders because Cemtrex "had to take back the plans *month after month*."  Thus, the Individual Defendants knew or recklessly disregarded that a closing of the Paderborn plant was a foregone conclusion and it would not be generating anywhere close to $33 million in revenue – a figure that dwarfed the entire EMS segment's revenue for fiscal 2016.

4. **Cemtrex's Disclosure Control Deficiency Evidences a "Tone at the Top" that Disregarded Full and Candid Disclosure**

274.    Various laws and regulations, including the federal securities laws and SOX, require a company to develop effective "tone at the top" by, for example, requiring a company's senior management to develop and oversee procedures that ensure that all material information (including those disclosures required by law) reaches those responsible for reporting it to the investing public.

275.    As the Company's top executives, the Individual Defendants had responsibility for setting the "tone at the top" throughout the Class Period.

276.    The spate of March 2017 corrective Form 3s and Form 4s evidence that the Company's disclosure controls were wholly inadequate and any statements contained in the Company's SEC filings as to the adequacy of these controls were a fiction created by the Individual Defendants to otherwise pay lip-service to their mandated duties.

277.    To be clear, none of the Company's misrepresentations regarding Cemtrex insiders' compliance with Section 16(a) would have occurred had the Individual Defendants effected an appropriate "tone at the top," particularly as it was predominantly the Individual Defendants themselves who were in violation of the reporting requirements.

278.    Moreover, Defendants Saagar Govil's and Dela Rama's certifications concerning the effectiveness of the Company's disclosure and internal controls despite the existence of the obvious deficiency over which each of these Defendants themselves had actual and direct control makes it implausible that these defendants could have simply made an innocent mistake in making the affirmative misrepresentation that each Cemtrex insider was in compliance with the law.

279.   Tellingly, it was within two weeks of the Pearson Article's publication that the several Cemtrex insiders, including defendants Saagar Govil and Dela Rama, each filed wide reaching Form 3s and/or Form 4s to correct years of noncompliance.

**B.  The Individual Defendants' Motive to Commit the Alleged Fraud**

> **1.  The Individual Defendants' Use of Common Stock as Currency to Fund Acquisitions and Grow the Company Provided Motive to Commit Fraud**

280.   Prior to and throughout the Class Period, as a result of the Individual Defendants' perpetual looting of the Company through related party and other transactions, Cemtrex was highly leveraged, carrying long-term debt in an amount as high as 68% of total assets during the Class Period.  Accordingly, the Company was unable to fund operations or expand organically. Thus, the Individual Defendants used the Company's common stock as currency to position Cemtrex to grow inorganically through acquisitions.

281.   As set forth herein, *supra*, Section IV.E, Cemtrex's stock was essential to the Individual Defendants' efforts, as every growth acquisition included an equity component – whether initially as part of the transaction or as part of a subsequent insider deal between the Company and Ducon to cancel certain debt in exchange for Cemtrex securities, including the following alleged herein:

- December 30, 2004 - Cemtrex purchases the MIP division from Ducon, issuing to Arun Govil (Ducon's sole owner) 3,250,000 shares of common stock;

- April 30, 2007 – Cemtrex purchases Griffin from Arun Govil for $2.75 million, (i) paying cash of $700,000; (ii) issuing 20,000,000 shares of common stock valued at $750,000; and (iii) issuing a four year convertible debenture in the amount of $1,300,000, eventually converting the $1.3 million debenture held by

A. Govil into 2,500,000 shares of Cemtrex common stock and 1,000,000 shares of Cemtrex Series A Preferred stock;

- April 31, 2013 – Purchase of the ROB Group for $5.60 million, financed partially through a $2.7 million loan from Ducon;

- December 15, 2015 – Purchase of AIS for $7.7 million, including the issuance of 315,458 shares of Cemtrex common stock;

- May 31, 2016 – Purchase of Periscope for financed partially through a $3.3 million note to Ducon, subsequently exchanged for approximately 334,000 shares of the Company's series 1 preferred stock and 668,000 series 1 warrants.

282.    The Individual Defendants were able to expand the Company's stock base in order to effect these transactions by virtue of a broad certificate of incorporation that vested nearly unlimited power in the Board, and a Board that was entirely beholden to Arun Govil.

283.    Upon assuming control of the Company, Arun Govil bent the Company's equity guidelines to fit his needs, amending the certificate of incorporation in September 2006 to authorize four hundred million shares of Cemtrex common stock for distribution, along with 10,000 shares of preferred stock.  This amendment provided that the "shares of stock of the Corporation, regardless of class, may be issued by the Corporation from time to time in such amounts, for such consideration and for such corporate purposes as the Board of Directors may from time to time determine."  At the time, the Company's Board of Directors consisted solely of Arun Govil as Chairman of the Board and his wife, Vandana Govil, Cemtrex's Secretary.

284.    In March 2007, Cemtrex's articles of incorporation were again amended, amending the Company's capital stock structure to authorize 900,000,000 shares of common stock and 10,000,000 shares of preferred stock.  This increase of common stock occurred just

prior to the April 30, 2007 purchase by Cemtrex of all issued and outstanding membership interest in Griffin from Arun Govil, who was the owner of 100% of the membership interest in Griffin at the time of the transaction.  The $2.75 million transaction included the issuance of 20,000,000 shares of common stock values at $750,000 to Arun Govil, as well as a $1.3 million debenture that was convertible into an additional 30,000,000 shares of Cemtrex common stock. That debenture was ultimately converted in September 2009 to 2,500,000 shares of common stock and 1,000,000 shares of Series A Preferred Stock.

285.    The number of common stock available to the Cemtrex Board increased just two months later when in May 2007, the capital stock allotment for Cemtrex was changed to consist of 1,500,000,000 shares of common stock and ten million shares of preferred stock.

286.    In August 2007, the Company again amended its articles of incorporation, drastically reducing the number of shares of common stock available for distribution from the 1.5 billion authorized in May to 70,000,000.

287.    In April 2015, and in preparation for the Company's uplisting to the Nasdaq and the reverse stock split, the Company amended its articles of incorporation to provide for 20,000,000 shares of common stock and 10,000,000 shares of preferred stock.

288.    The goal of the Individual Defendants was simple: leverage the Company's common stock to finance expansion.  Arun Govil stated as much in the Company's February 23, 2017 conference call:

> Yeah. Matthew, you are making sense. Matthew, you rightly said because we control such significant portion of the company. We could have easily issued more equity and raised the money. And we had a lot of offers for that. . . But, we treat stock as a currency, and that's why we issued preferred with a non-convertible preferred, okay? And because we did that, you know, that's more of an obligation for us, actually.

289.    In response to an investor's question on the conference call about the ability of the Company to execute a stock buyback and still finance an acquisition, both Saagar and Arun Govil extolled the virtue of the Company's process to that point, with Arun Govil reiterating the Company's use of stock as currency:

> Saagar Govil: —That's true, but—that's true, but—okay. But, I think it's also fine to know that, um, you know, we've grown this company, um, by issuing a lot of—you know, by issuing a lot of commercial debt. And, um, it's been very cheap. And I think if we're able to continue, um, you know, using that cash and spreading it out and using it over, um, a few different opportunities, um, it can go very far for us. So—but, you're right. I mean we'll certainly look at both options.

> Arun Govil: Yeah, this is definitely a possibility because, uh, stock is currency for us. And, uh, we will look at that. That's—definitely. But, we will also, as Saagar said, look at the options we have and, uh, how much can the company grow with the amount of cash? We know that acquisitions require a lot of cash. So, we'll be looking at both of these things, yes, absolutely.

290.    As a company with few prospects for organic growth, these acquisitions provided a much-needed lifeline and the Individual Defendants' regular use of stock, rather than cash to pay for said acquisitions, provided additional motivation for them to hide any insider transactions that might have otherwise shaken investor confidence and would have required the issuance of additional shares to effect these transactions, thus further diluting the Individual Defendants' significant insider holdings.

## 2.  The Individual Defendants Oversaw Multiple Stock Buybacks in an Effort to Inflate Cemtrex's Stock Price

291.    As part of their fraudulent scheme, the Individual Defendants caused the Company to repurchase over 331,000 of its outstanding shares with shareholder money during the Class Period.  These shares were purchased at prices that were inflated by the Individual Defendants' materially false and misleading statements regarding insider holdings.  By using shareholder money to engage in these buybacks, the Individual Defendants further inflated the

price of Cemtrex's stock in order to further enrich themselves and increase the value of their own holdings.

292.    On June 22, 2016, the Company announced that the Cemtrex Board had authorized the repurchase of up to one million shares over the upcoming twelve months, seeking to counterbalance the dilutive effect of the issuance of more than 300,000 shares of common stock in connection with the AIS purchase in late December 2015.

293.    On March 1, 2017, seeking to curb the stock drop downfall related to the Disclosure Articles, the Company announced the purchase of 201,430 shares at an average purchase price of $3.84 per share.

294.    On March 13, 2017, the Company announced that over the prior ten days, Cemtrex had acquired an additional 130,409 shares of Cemtrex common stock.

295.    According to the Company's annual report for the fiscal year ending September 30, 2017, Cemtrex repurchased and retired a total of 363,528 shares of common stock with a par value of $0.01 at a cost of more than $1.3 million.

296.    The entire stock buyback coincided with the Company's efforts to mitigate the stock fall related to the release of the Disclosure Articles and belated insider transaction disclosures, to artificially prop up the Company's stock price to the benefit of the Individual Defendants.

### 3. Defendant Arun Govil was Motivated to Commit Fraud so as to Clandestinely Sell Off Significant Holdings Through Ducon and Cash In on his Cemtrex Investment

297.    From the outset, Cemtrex appears to have been nothing more than a pawn created by Arun Govil so as to move assets between controlled companies in order to secure for himself the most lucrative benefits.

298.    In addition to the self-dealing identified herein (including the execution of convertible debt instruments and the sale of assets between Arun Govil-controlled companies and Cemtrex), the operations of Cemtrex and Ducon are significantly intertwined.

299.    As reported by the Company in its SEC filings, Cemtrex leases its office space in Farmingdale, New York from Ducon.

300.    The Company's CFO/Vice President of Finance defendant Dela Rama is also employed by Ducon as an accountant.

301.    According to the publicly available LinkedIn profile of Cemtrex's former director Ravi Narayan, he is a product manager for an entity known as "Ducon Cemtrex."

302.    Arun Govil was also able to use his position of power over the Company to essentially park money at Cemtrex and extract from the Company exceptional interest rates on the debt.  For example, on April 30, 2007, the Company and Arun Govil entered into an 8% debenture due April 30, 2011.  The debenture called for the payment of interest accruing daily at a rate of 8.0% per annum with payments to be made semiannually to Arun Govil on the first business day of January and July each year until fully repaid.

303.    On September 9, 2009, the Company and Arun Govil entered into an agreement to cancel the debenture in exchange for the issuance of 2,500,000 shares of common stock and 1,000,000 shares of Series A Preferred stock, but this was only after collecting hundreds of thousands of dollars in interest on the note.

304.    Further, the Series A Preferred shares given to Arun Govil effectively ensured that he and he alone would continue to control the operations of Cemtrex.  Each issued and outstanding preferred share entitled Arun Govil to a number of votes equal to: (i) the number of shares of Common Stock issued and outstanding at the time of such vote multiplied by 1.01;

divided by (ii) the total number of Preferred Stock issued and outstanding at the time of such vote. This formulation of Preferred Stock, coupled with the fact that the Company had not issued these preferred shares to any other individual, ensured that no matter how many shares of common stock were issued and outstanding, Arun Govil's preferred holdings would always afford him the voting power to out-vote all others.

305.     Further, during the early stages of the Company (including during the Class Period), Cemtrex was reliant on sales to Ducon for the bulk of its sales:

|  | Net Sales | Sales to Ducon | % of Total Sales | Accounts Receivable from Ducon | Accounts Receivable From Non-Ducon Entities | % of Total Accounts Receivable Attributable to Ducon |
|---|---|---|---|---|---|---|
| 2010 | 3,304,055.00 | 200,000.00 | 6% | 200,000.00 | 31,968.00 | 21% |
| 2011 | 13,732,153.00 | 8,920,875.00 | 65% | 1,127,575.00 | 261,549.00 | 81% |
| 2012 | 12,162,046.00 | 7,260,425.00 | 60% | 354,786.00 | 293,155.00 | 55% |
| 2013 | 13,673,531.00 | 10,799,872.00 | 79% | 1,206,372.00 | 641,264.00 | 65% |

306.     Thus, Arun Govil was operating Ducon and Cemtrex to carry out his shell game and make Cemtrex appear profitable, seeking to induce outside investment into the Company.

307.     Despite Ducon's regular and seemingly significant purchases from Cemtrex over the prior several years, beginning in 2014 the Company began reporting *zero* in sales to Ducon. This marked shift in customer base coincided with Cemtrex's acquisition of the ROB Group in Germany, an acquisition that purportedly drove an 825% increase in net income for the fiscal year ending September 30, 2014. Of course, that did not mean that Arun Govil or Ducon were no longer profiting from Cemtrex in other ways, as Ducon provided a $2.7 million loan to help finance the ROB acquisition that paid it 5% interest per annum.

103

308.    On May 31, 2016, Ducon provided Cemtrex with a long-term note in the amount of $3,339,833 to cover a portion of the Company's purchase of Periscope.  This note, which was to collect interest at 5% per annum, was subsequently converted by the Company and Ducon into 333,983 shares of the Company's Series 1 preferred stock and 667,967 series 1 warrants.

309.    This conversion into Series 1 preferred stock was key to the Company because it eliminated long-term debt from the Company's financial statements in an effort to potentially open the Company to more traditional debt financing – financing the Company had been unable to adequately secure to that point.

310.    For its part, Arun Govil secured for himself 333,983 shares of Series 1 Preferred Stock that entitled him to receive cumulative cash dividends at a rate of 10% of the purchase price per year, payable seminannually.  These preferred shares ranked senior to common stock with respect to dividends and carried with them a liquidation preference of $10.00 per share and further provided Arun Govil with two additional votes for every Series 1 Preferred share owned.

311.    The Company has not made the full terms of the original long-term note available to the public, however, the benefit to Arun Govil of such a transaction is still evident.  Assuming a ten year repayment period on the $3,339,833 note at 5% per annum, Cemtrex would have repaid total interest in the amount of approximately $911,000 over the ten year period. Over that same period, Arun Govil will now collect $3.339 million in preferred stock dividends while further entrenching himself as controller of the Company through the additional voting power. Additionally, Arun Govil received warrants to purchase more than 667,000 shares of common stock at $6.31 per share at any time over the next five years, providing an additional vehicle for Arun Govil to capitalize on any Company upside.

312.   Despite seemingly stockpiling Company securities, Arun Govil and Ducon's holdings were not being purchased on the open market, but instead were the product of several financial maneuvers by the Company and Arun Govil to manipulate Cemtrex's debt and shareholder equity positions to contort the Company's financials to appease the market. Defendants' intent to misrepresent is evident, particularly with respect to Arun Govil and Ducon's failure to timely file its SEC disclosures, as set forth *supra*, as well as the seeming disconnect between the SEC filings and the Company's own SEC reports that appear to show a large block of Ducon's holdings as sold and/or unaccounted for.

313.   Further, Saagar Govil was not above lying about Arun Govil and Ducon's investment activities in an effort to assuage market concern and control the stock drop in the wake of the Disclosure Articles.  In the investor conference call on February 23, 2017, Arun Govil stated in no uncertain terms, "Ducon also bought over 300,000 units of preferred shares on the same terms as all other investors in the recent rights offering."  In fact, there was no purchase of units of preferred shares and the exchange was another ploy in a long line of equity contortion to give the illusion of insider support for the Company.

### 4. Defendant Dela Rama was Motivated to Commit Fraud So as to Cash in his Cemtrex Equity – his Primary Compensation from the Company

314.   Defendant Dela Rama's role with the Company appears to have been amorphous and ever-shifting.  In the Company's May 14, 2008 registration of securities with the SEC (the first filing made by Cemtrex with the regulator), defendant Dela Rama is listed as the Company's Vice President of Finance, a position he purportedly held since December 2004.  That same document also discloses that Defendant Dela Rama is the Controller of Ducon, having also joined that company in that position in 2004.

315.    Notably, this registration document and its subsequent amendments report zero equity holdings for Dela Rama in the Company and entirely omit him from the summary compensation table, reporting only the $125,000 per year salaries of Arun Govil and his wife, Vandana Govil, who was then the Company's secretary and a director.

316.    The trend continued for 2008, with the Company omitting Dela Rama from its salary reporting in its annual report filed on Form 10KSB with the SEC on January 13, 2009 while indicating no holdings in the Company.

317.    According to the annual report filed by the Company on Form 10-K on January 13, 2013, at some point between the January 2009 Form 10KSB and January 8, 2010, defendant Dela Rama came to acquire 400,000 shares in Company common stock.  It was also during this period that Dela Rama became a director of the Company.  However, despite this elevation in position, Dela Rama continued to be omitted from the Company's compensation description (despite the inclusion of two other vice president/directors of Cemtrex in the same table), indicating that defendant Dela Rama was not being compensated for his role with Cemtrex.

318.    Defendant Dela Rama's dual roles as vice president for Cemtrex and an accountant for Ducon would continue into the fiscal year ending September 30, 2010, with the Company again reporting no salary paid to Dela Rama in its annual report filed on Form 10-K with the SEC on January 14, 2011.

319.    After having previously been identified only as the Company's Vice President of Finance, beginning with the annual report filed by the Company with the SEC on January 10, 2012, defendant Dela Rama was identified as Cemtrex's Chief Financial Officer.  Despite this new title, the annual report claims Dela Rama had been in that position since December 2004.

106

Yet even with this elevation in title, Dela Rama appears to have drawn zero salary from the Company as he is entirely omitted from the executive compensation discussion.

320.    In its annual report filed on Form 10-K on December 26, 2012, the Company included defendant Dela Rama in its compensation table.  Surprisingly, the table showed that the Company paid no salary to its Chief Financial Officer for 2010, 2011, or 2012:

| NAME AND PRINCIPAL POSITION | YEAR | SUMMARY COMPENSATION TABLE | | | LONG-TERM COMPENSATION AWARDS |
| | | ANNUAL COMPENSATION TABLE | | | SECURITIES UNDERLYING OPTIONS/SARS |
| | | SALARY | BONUS | OTHER | |
| Arun Govil, Chairman, | 2010 | $ 115,482 | $       0 | $       0 | — |
| | 2011 | $ 100,000 | | | — |
| | 2012 | $   57,539 | $       0 | $       0 | — |
| Sangar Govil, Chief Executive Officer President | 2010 | $          0 | $       0 | $       0 | — |
| | 2011 | $ 100,000 | | | — |
| | 2012 | $ 100,000 | $       0 | $       0 | — |
| Ravi Naravan, Vice President, Director | 2010 | $   92,456 | $       0 | $       0 | — |
| | 2011 | $   99,570 | | | — |
| | 2012 | $   99,570 | $       0 | $       0 | — |
| Renato Dela Rama, Chief Financial Officer | 2010 | $          0 | $       0 | $       0 | — |
| | 2011 | $          0 | | | |
| | 2012 | $          0 | $       0 | $       0 | |

321.    The disclosure regarding defendant Dela Rama was short-lived, however, as the Company reverted to omitting any reference to his salary in its annual report filed with the SEC on Form 10-K on January 16, 2014.

322.    Dela Rama appears to have drawn zero in salary from the Company for 2014, with the Company omitting any reference to his compensation for the year in its proxy statement filed on Schedule 14A with the SEC on November 13, 2014.

323.    Notably, despite referring to Dela Rama as the Company's chief financial officer in its annual report filed with the SEC on Form 10-K on December 29, 2014, Dela Rama's title reverted to Vice President of Finance beginning with the quarterly report filed on Form 10-Q on February 13, 2015.

324.     The title change would stick, with the Company reporting in its proxy statement filed on Schedule 14A with the SEC on February 8, 2016 zero in salary for defendant Dela Rama for 2013, 2014, or 2015, but common stock holdings of 66,667 shares (400,000 *divided by* 6, per the reverse stock split):

| PRINCIPAL AND POSITION | YEAR | SALARY | BONUS | OTHER | SECURITIES UNDERLYING OPTIONS/SARS |
|---|---|---|---|---|---|
| Saagar Govil | 2013 $ | 150,000 $ | - $ | - $ | |
| Chairman (as of June 2014), | 2014 $ | 150,000 $ | - $ | - $ | - |
| Chief Executive Officer, and President | 2015 $ | 150,000 $ | - $ | - $ | - |
| Renato Dela Rama | 2013 $ | - $ | - $ | - $ | |
| Vice President of Finance | 2014 $ | - $ | - $ | - $ | - |
| | 2015 $ | - $ | - $ | - $ | - |

325.     Despite years of reporting no salary paid to defendant Dela Rama, on January 30, 2017, the Company suddenly reversed course when, in a proxy statement filed on Schedule 14A, Cemtrex reported a salary paid to Dela Rama of $40,000 per year for 2014, 2015, and 2016, while also stating that Dela Rama was additionally compensated $60,000 per year for 2015 and 2016 from Ducon for his work for that company:

| PRINCIPAL AND POSITION | YEAR | SALARY | BONUS | OPTION AWARDS | OTHER |
|---|---|---|---|---|---|
| Saagar Govil | 2014 | $ 150,000 $ | - $ | - $ | - |
| Chairman (as of June 2014), | 2015 | $ 150,000 $ | - $ | - $ | - |
| Chief Executive Officer, and President | 2016 | $ 150,000 $ | - $ | 340,000.00(1) $ | - |
| Renato Dela Rama (2) | 2014 | $ 40,000 $ | - $ | - $ | - |
| Vice President of Finance | 2015 | $ 40,000 $ | - $ | - $ | - |
| | 2016 | $ 40,000 $ | - $ | - $ | - |

(1)   The Option Awards Column in the table above reflects the aggregate grant date fair value of the award granted in the year noted. Please see Options/SAR Grants in the Last Fiscal Year below for more information relating to this option grant.

(2)   Mr. Dela Rama is also employed by Ducon Technologies, Inc. an entity owned by Aron Govil, Executive Director of the Company. In the fiscal years ended September 30, 2015 and 2016, Mr. Dela Rama received compensation of $60,000 for each fiscal year from Ducon Technologies Inc.

326.     When viewed through the lens of his limited compensation from Cemtrex, Dela Rama's motive for his participation in the fraudulent scheme and undisclosed sell off of nearly 20% of his equity position becomes clear: Cemtrex was an afterthought and solely an

opportunity to collect financial gains from the sale of stock for its supposed CFO, whose real allegiances laid with Ducon and Arun Govil.

> **5.  The Individual Defendants Were Motivated to Conceal the Truth About the Closing of the Paderborn Facility and the Company's Automotive EMS Business in Order to Conduct the Rights Offering**

327.    After being forced to withdraw its S-3 shelf registration earlier in the year, on August 29, 2016, the Company announced a rights offering whereby Cemtrex would sell a subscription right to up to an aggregate of 1,500,000 units, each consisting of one share of Cemtrex Series 1 non-convertible preferred share and one Series 1 give year warrant to purchase two shares of Cemtrex common stock.

328.    After amendments to the rights offering registration statement on November 4, November 23, and December 7, 2016, the SEC declared the S-1 registration statement effective on December 12, 2016 (having accelerated the process at the request of Cemtrex's counsel).

329.    Each warrant would cost $10, with the Company expecting proceeds, before expenses of $14.1 million.

330.    The rights offering commenced on December 28, 2016.  The Company completed the rights offering on February 2, 2017, collecting total proceeds of $14,018,750 before payment of the dealer-manager fee and other offering expenses.  After proceeds, the Company would net $12,817,300.

331.    Had the truth about the Company's closure of the Paderborn facility or the fact that the Company's own CFO had sold 7,500 shares of common stock (or 14% of his holdings) in the two months prior to the announcement of the rights offering entered the market, investor confidence in the Company would have dried up and left the Company unable to obtain the cash from the offering it desperately needed.

## IX.   LOSS CAUSATION

332.    The market for Cemtrex's common stock was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Cemtrex stock traded at artificially inflated prices during the Class Period.

333.    Lead Plaintiffs and other members of the Class purchased or otherwise acquired Cemtrex stock relying upon the integrity of the market of Cemtrex and market information related to the Company, and have been damaged thereby.

334.    As Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Cemtrex's securities was removed, and the price of Cemtrex shares fell.

335.    On February 22, 2017, the Pearson Article, Unemon Article 1, and Unemon Article 2 were published, shedding light on various inconsistencies in the Company's public SEC filings, including the diminishing insider stock holdings in the absence of the requisite Form 3s and Form 4s and the Company's claim of ownership over its Indian subsidiary.  The publication of these articles sent the Company's common stock downwards from a closing price of $5.12 on February 21, 2017 (on volume of 972,000 shares), to a closing price of $3.40 on February 22, 2017 on volume of more than 8.2 million shares – representing a loss of nearly 34%.

336.    In response to the Disclosure Articles' publication, the Company issued its own press release late in the afternoon on February 22, 2017 and then subsequently followed up with a conference call with investors on February 23, 2017 – in each, ardently denying the facts set forth in the Pearson Article.  The Company's response had the effect of temporarily curbing the Company's stock price drop, as Cemtrex stock rose on February 23, 2017 to close at $4.02, an 18% increase over the prior day's closing price.

337.     Despite a vehement denial of any of the claims set forth in the Disclosure Articles, by early March 2017, Company insiders could no longer run from the fact that each had violated Section 16(a) by failing to timely file their Form 3s and Form 4s.

338.     On February 28, 2017, the Company informed the German works council and affected employees of its intention to close its Paderborn, German facility and lay off the more than 100 employees.   The announcement negatively impacted the Company's stock price, sending Cemtrex's stock to a closing price of $3.54, down more than 7% over the prior day's close of $3.82.

339.     On March 2, 2017, German news media began reporting on the Company's plans to close the site of its ROB Cemtrex Automotive GmbH facility.   On this news, the Company's stock price would drop nearly 10%, from a closing price of $4.05 on March 1, 2017 to $3.66 on March 2, 2017.

340.     During the afternoon of March 3, 2017, Defendant Dela Rama filed a Form 4 disclosing thirteen separate transactions occurring between March 2015 and July 2016, all but one of which involved the disposal of Company stock.

341.     On March 6, 2017, Saagar Govil filed a Form 4 disclosing eight separate transactions in Company stock, all taking place between February 2013 and February 2017.

342.     Also on March 6, 2017, Unemon1 published Unemon Article 3, reporting on the Company's closure of the Paderborn plant and the attendant economic issues.

343.     On March 6, 2017, the Company's common stock closed at $3.35 per share, a nearly 9% decline over the closing price on March 3, 2017.

344.     As a result of their purchases of Cemtrex stock during the Class Period at artificially inflated prices, Lead Plaintiffs, and the other Class members suffered economic loss,

*i.e.*, damages, under the federal securities laws. The timing and magnitude of the price decline in Cemtrex stock negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

## X.     PRESUMPTION OF RELIANCE

345.    At all relevant times, the market for Cemtrex common stock was efficient for the following reasons:

(a)     Cemtrex common stock met the requirements for listing, and was listed and actively traded, first on the OTCBB, and then the Nasdaq, each highly efficient and automated market;

(b)     As a regular issuer, Cemtrex filed periodic reports with the SEC;

(c)     Cemtrex regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Cemtrex was followed by numerous securities analysts employed by brokerage firms, who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace;

(e)     From June 2015 to March 2017, the average weekly trade volume of Cemtrex common stock was approximately 1.3 million shares – more than ten percent of the total number of shares of Cemtrex common stock outstanding over the same period; and

(f)     Cemtrex's Class Period ineligibility to file an S-3 Registration Statement was related to its failure to file adequate reports to the SEC for the preceding twelve months, as

discussed *supra*, and not because of any market inefficiency, as evidenced by the fact that the Company conducted an S-3 offering on the Nasdaq just three months after the end of the Class Period, which was declared effective by the SEC on June 14, 2017.

346.    As a result of the foregoing, the market for Cemtrex securities promptly digested current material information regarding Cemtrex from all publicly available sources and reflected such information in Cemtrex's stock price. Under these circumstances, all purchasers of Cemtrex securities during the Class Period suffered similar injury through their purchase of Cemtrex securities at artificially inflated prices, and a presumption of reliance applies.

347.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

348.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

349.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

350.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement.

351.   To the extent that the statutory safe harbor does apply to any forward-looking statement pleaded herein, Defendants are liable for any such statement because at the time such statement was made, and the particular speaker actually knew that the statement was false or misleading.

## XII.   CLASS ACTION ALLEGATIONS

352.   Lead Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Cemtrex securities during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

353.   Excluded from the Class are Cemtrex and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

354.   Because Cemtrex had millions of shares of common stock outstanding during the Class Period, and because its securities were actively traded, first on the OTCBB then the Nasdaq, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Lead Plaintiffs believe that there are, at a minimum, hundreds of Class members. Members of the Class may be identified from records maintained by Cemtrex or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

355.   Lead Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

356.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and securities litigation.

357.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

(a) Whether Defendants violated the federal securities laws as alleged herein;

(b) Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Cemtrex's business and operations;

(c) Whether the price of Cemtrex's securities was artificially inflated during the Class Period; and

(d) The extent to which members of the Class have sustained damages and the proper measure of damages.

358.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.    COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against Cemtrex and the Individual Defendants**

359.    Lead Plaintiffs reallege each allegation as if fully set forth herein.

360.    This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Cemtrex and the Individual Defendants (the "Count I Defendants").

361.    The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

362.    The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

363.    The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

364.    As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Lead Plaintiffs and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

365.    Cemtrex is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Cemtrex in taking the actions alleged herein.

366.     Lead Plaintiffs and the Class purchased Cemtrex securities, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects.  In so doing, Lead Plaintiffs and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Lead Plaintiffs and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

367.     At the time of the Count I Defendants' false statements, misrepresentations and omissions, Lead Plaintiffs and the Class were unaware of their falsity and believed them to be true. Lead Plaintiffs and the Class would not otherwise have purchased Cemtrex securities had they known the truth about the matters discussed above.

368.     By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

369.     As a direct and proximate result of the Count I Defendants' wrongful conduct, Lead Plaintiffs and the Class have suffered damages in connection with their purchase of Cemtrex securities.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against Cemtrex and the Individual Defendants

370.     Lead Plaintiffs reallege each allegation as if fully set forth herein.

371.     This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Cemtrex and the Individual Defendants (the "Count II Defendants").

372.    Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of Cemtrex, directly or indirectly, controlled the conduct of the Company's business and its representations to Lead Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act.  The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Lead Plaintiffs and the Class' investments in Cemtrex securities within the meaning of §20(a) of the Exchange Act. Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

373.    The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

374.    The Count II Defendants knew or recklessly disregarded the fact that Cemtrex's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

375.    By virtue of their high-level positions and their participation in and awareness of Cemtrex's operations and public statements, the Count II Defendants were able to and did influence and control Cemtrex's decision-making, including controlling the content and dissemination of the documents that Lead Plaintiffs and the Class contend contained materially false and misleading information and on which Lead Plaintiffs and the Class relied.

376.    The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

377.    As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

378.    As a direct and proximate result of the Count II Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase of Cemtrex securities.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Lead Plaintiffs as a representative of the Class;

B.    Awarding Lead Plaintiffs and the members of the Class damages, including interest;

C.    Awarding Lead Plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such other relief as the Court may deem just and proper.

## XV.    JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Lead Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

DATED:  May 7, 2018                Respectfully Submitted,

**LEVI & KORSINSKY LLP**

<u>/s/Shannon L. Hopkins</u>
Shannon L. Hopkins (SH-1887)
James Grohsgal (JG-1881)
Sebastiano Tornatore (to be admitted *pro hac vice*)
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
       jgrohsgal@zlk.com
       stornatore@zlk.com


*Counsel for the Cemtrex Investor Group and Lead Counsel for the Class*

**BRAGER EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
Melissa A. Fortunato
Todd H. Henderson
885 Third Avenue, Suite 3040
New York, New York 10022
Tel.: (212) 355-4648
Fax: (212) 214-0506
Email: eagel@bespc.com
       fortunato@bespc.com
       henderson@bespc.com


*Additional Counsel for the Cemtrex Investor Group*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 7th day of May, 2018, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

<em>/s/Shannon L. Hopkins</em>

Shannon L. Hopkins

121